IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| INA TATEUCHI and HELICOPTERS UNSAFE HERE, a Washington non-profit corporation, | ) ) ) ) | No. 80712-9-I |
| | ) | DIVISION ONE |
| Appellants, | ) ) | |
| v. | ) ) | |
| | ) | PUBLISHED OPINION |
| CITY OF BELLEVUE, a Washington municipal corporation, and KEMPER DEVELOPMENT COMPANY, a Washington corporation, | ) ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

BOWMAN, J. — Ina Tateuchi and Helicopters UnSafe Here (HUSH)

petitioned under the Land Use Petition Act (LUPA), chapter 36.70C RCW,

seeking to revoke Kemper Development Company's (KDC's) conditional use

permit authorizing use of a rooftop in the city of Bellevue (City) as a helistop.

Tateuchi and HUSH argued that KDC abandoned the land use because it had no

flight activity. They also claimed that the Bellevue City Council (Council) acted

contrary to the Open Public Meetings Act of 1971 (OPMA), chapter 42.30 RCW,

when it discussed their appeal from the City's land use decision in executive

session. The superior court denied the LUPA petition and dismissed the OPMA

claim under CR 12(b)(6). Because KDC has continually used the rooftop as a

Citations and pin cites are based on the Westlaw online version of the cited material.

helistop and the Council acted as a quasi-judicial body under the OPMA, we affirm.

## FACTS

In 2008, KDC applied for a conditional use permit (CUP) to construct a private helistop on the rooftop of the Bellevue Place Bank of America Building. Tateuchi urged the City to reject KDC's application, arguing that helicopter activity in the downtown corridor is a public safety danger. In the alternative, Tateuchi advocated to restrict flights to only twin-engine helicopters. After several public hearings, the City issued the CUP in May 2011 with the twin-engine limitation.[1]

KDC then obtained a building permit to upgrade the rooftop to meet Federal Aviation Administration (FAA) design standards and City building code requirements. In 2013, the site became operational. The CUP required an active communications system and website for residents, which KDC has continually maintained. As a condition of the CUP, KDC also files routine usage reports with the City, attesting that the helistop remains "fully operational." KDC reported no helicopter landings or takeoffs at the helistop, except for one flight in 2015.

In 2016, Tateuchi applied to the City to revoke the CUP, claiming KDC abandoned its conditional use because there had been no helicopter takeoffs or

---

[1] Tateuchi appealed the CUP approval to King County Superior Court. The court affirmed the CUP. The City has since adopted Bellevue Ordinance 6277 (March 2016), which prohibits future CUPs for private helistops, and allows only government and hospital "heliports" used exclusively for emergency purposes.

landings.[2]  In response, the City held an informational meeting and considered comments from members of the community about whether to revoke the CUP. After hearing public comment, the Bellevue Development Services Department director recommended that the City deny Tateuchi's application.  The City set a public hearing before a hearings examiner for March 2018 on Tateuchi's application to revoke KDC's CUP.

At the March 22, 2018 public hearing, the hearing examiner considered argument from the City, KDC, and Tateuchi.  After the hearing, she issued written findings of fact and conclusions of law denying Tateuchi's application.  The hearing examiner concluded:

> [T]he absence of helicopters landings at the Bellevue Place Helistop is not determinative of discontinuance.  As long as KDC has actively maintained and even improved the helistop, it has not committed any overt act evidencing abandonment.  Nor does the lack of helicopter landings evidence intent to abandon.

Tateuchi and HUSH (collectively Tateuchi) appealed the hearing examiner's decision to the Council.[3]  The Council considered an extensive written record and held a "limited" public hearing after their regular meeting on June 18, 2018.  Before hearing argument, the mayor explained that the hearing was "confined to the issues decided by the Hearing Examiner" and

> [a]s noted earlier at oral communication, the Council has not been able to take public comment on this matter because it is a quasi-judicial proceeding and does not follow Council's normal process[.]  Because the record of this matter officially closed with the issuance of the Examiner's decision, no additional evidence or

---

[2] Tateuchi also claimed KDC obtained CUP approval "by misrepresentation of material fact."

[3] HUSH was not a party until the appeal of the hearing examiner's decision.

3

public comment can be considered by Council in rendering a decision on the Examiner's decision.

Tateuchi's attorney urged the Council to review the record carefully. He told the Council, "I hope you folks are not going to make a decision tonight because I hope you will go back and look at the record." The mayor responded:

I do not anticipate we will make a decision tonight[.] We are planning to go into Executive Session to discuss the merits of the case and . . . adjourn from the Executive Session without making a decision[.] We would come back at a later date to have a discussion about what our decision would . . . be.[4]

After the hearing, the mayor reiterated that the Council was "planning to go into an Executive Session to discuss the merits of the case."[5] The Council began its deliberations in executive session that night and then adjourned to a later date for further consideration.

Three months later, the Council addressed Tateuchi's appeal at their September public meeting. The Council voted on the record to deny Tateuchi's appeal and to adopt the hearing examiner's findings and conclusions denying the application to revoke KDC's CUP. The City codified the Council's decision as Bellevue Ordinance 6429 (Oct. 2018).

Tateuchi filed a LUPA petition in King County Superior Court, claiming the City erred in determining KDC had not abandoned its use of the rooftop. In the alternative, Tateuchi alleged the City violated the OPMA because the Council

---

[4] Neither side objected to this procedure.

[5] Again, no one objected.

"deliberated in secret."[6] The superior court affirmed the City's denial of Tateuchi's appeal and denied "in full" Tateuchi's LUPA petition. The superior court also granted the City's motion to dismiss Tateuchi's LUPA petition and the OPMA claim under CR 12(b)(1) and (6) with prejudice.[7] Tateuchi sought direct review before the Supreme Court, which transferred review to this court.

ANALYSIS

LUPA

Tateuchi argues the term "abandoned" in Bellevue Land Use Code (BLUC) 20.30B.170(B)(1) can be satisfied by showing only that property is not being used for the purpose contemplated by a CUP. They claim the City erred by concluding that a property owner must also express an intent to abandon the conditional use. Tateuchi also argues the City erred by concluding KDC continually used the rooftop as a helistop after the CUP issued.

LUPA governs judicial review of land use decisions. RCW 36.70C.030. In reviewing a land use decision, we stand in the same position as the superior court. Phoenix Dev., Inc. v. City of Woodinville, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011). We review a LUPA petition using the administrative record admitted before the trial court. Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wn.2d 740, 751, 49 P.3d 867 (2002), abrogated on other grounds by Yim v. City of Seattle, 194 Wn.2d 682, 451 P.3d 694 (2019).

---

[6] Tateuchi also filed alternative claims for statutory and constitutional writs of review, a writ of mandamus, and declaratory and injunctive relief that the superior court dismissed. Tateuchi does not appeal the dismissal of those claims.

[7] The court later amended the order granting the City's motion to dismiss the OPMA claim pursuant to only CR 12(b)(6).

"Under LUPA a court may grant relief from a local land use decision only if the party seeking relief has carried the burden of establishing that one of the six standards listed in RCW 36.70C.130(1) has been met." Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 175, 4 P.3d 123 (2000). RCW 36.70C.130(1) provides:

> The superior court, acting without a jury, shall review the record and such supplemental evidence as is permitted under RCW 36.70C.120. The court may grant relief only if the party seeking relief has carried the burden of establishing that one of the standards set forth in (a) through (f) of this subsection has been met. The standards are:
> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
> (d) The land use decision is a clearly erroneous application of the law to the facts;
> (e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
> (f) The land use decision violates the constitutional rights of the party seeking relief.

Tateuchi seeks relief under subsections (a),[8] (b), (c), and (d).

Whether the hearing examiner erroneously interpreted the law is a question that we review de novo. Phoenix Dev., 171 Wn.2d at 828. When reviewing a challenge to the sufficiency of evidence, we view facts and inferences " 'in a light most favorable to the party that prevailed in the highest

---

[8] Tateuchi claims error under subsection (a) because the hearing examiner refused to let them provide more evidence of abandonment. Because Tateuchi cites no legal authority in support of this claim, we do not consider their argument. See RAP 10.3(a)(6) (A brief must contain "citations to legal authority and references to relevant parts of the record" for each assignment of error.).

forum exercising fact finding authority' "—here, the City and KDC. Woods v. Kittitas County, 162 Wn.2d 597, 617, 174 P.3d 25 (2007)[9] (quoting Benchmark Land Co. v. City of Battle Ground, 146 Wn.2d 685, 694, 49 P.3d 860 (2002)). Under the substantial evidence standard, there must be sufficient evidence in the record to persuade a reasonable person that the declared premise is true. Wenatchee Sportsmen, 141 Wn.2d at 176. A finding is "clearly erroneous" only when the reviewing court "is 'left with the definite and firm conviction that a mistake has been committed.' " Cougar Mountain Assocs. v. King County, 111 Wn.2d 742, 747, 765 P.2d 264 (1988)[10] (quoting Polygon Corp. v. City of Seattle, 90 Wn.2d 59, 69, 578 P.2d 1309 (1978)).

I. Definition of "Abandoned"

Tateuchi argues the hearing examiner erred by concluding that the term "abandoned" in BLUC 20.30B.170(B)(1) means an "overt act" as well as an "intent to abandon" conditional use of property.

BLUC 20.30B.120 defines the purpose of a CUP:

A Conditional Use Permit is a mechanism by which the City may require special conditions on development or on the use of land in order to ensure that designated uses or activities are compatible with other uses in the same land use district and in the vicinity of the subject property.

Under the BLUC, the City may revoke a CUP only upon a finding that

1. The use for which the approval was granted has been abandoned for a period of at least a year; or
2. Approval of the permit was obtained by misrepresentation of material fact; or

---

[9] Internal quotation marks omitted.

[10] Internal quotation marks omitted.

3. The permit is being exercised contrary to the terms of approval. BLUC 20.30B.170(B).

"The same rules of statutory construction apply to the interpretation of municipal ordinances as to the interpretation of state statutes." City of Seattle v. Green, 51 Wn.2d 871, 874, 322 P.2d 842 (1958).

> In interpreting a statute the "fundamental objective is to ascertain and carry out the Legislature's intent. [I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent."

Seattle Hous. Auth. v. City of Seattle, 3 Wn. App. 2d 532, 538, 416 P.3d 1280 (2018)[11] (quoting Citizens All. for Prop. Rights Legal Fund v. San Juan County, 184 Wn.2d 428, 435, 359 P.3d 753 (2015)).

We determine the plain meaning of a statute by looking to " 'the ordinary meaning of words, the basic rules of grammar, and the statutory context to conclude what the legislature has provided for in the statute and related statutes.' " Seattle Hous. Auth., 3 Wn. App. 2d at 541 (quoting In re Forfeiture of One 1970 Chevrolet Chevelle, 166 Wn.2d 834, 838-39, 215 P.3d 166 (2009)). "When construing an ordinance, a 'reviewing court gives considerable deference to the construction of the challenged ordinance by those officials charged with its enforcement.' " Phoenix Dev., 171 Wn.2d at 830[12] (quoting Ford Motor Co. v. City of Seattle, Exec. Servs. Dep't, 160 Wn.2d 32, 42, 156 P.3d 185 (2007)).

The BLUC does not define the term "abandoned." To determine the ordinary meaning of an undefined term, we look to standard English language

---

[11] Alteration in original.

[12] Internal quotation marks omitted.

8

dictionaries. Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 877, 784 P.2d 507 (1990). Webster's Third New International Dictionary 2 (2002) defines "abandoned" as "to cease to assert or exercise an interest, right, or title to esp[ecially] with the intent of never again resuming or reasserting it." Likewise, Black's Law Dictionary 2 (10th ed. 2014) defines "abandonment" as "[t]he relinquishing of a right or interest with the intention of never reclaiming it."

We may also look to the common law to determine the meaning of undefined terms. See Ralph v. Dep't of Nat. Res., 182 Wn.2d 242, 248, 343 P.3d 342 (2014) (quoting N.Y. Life Ins. Co. v. Jones, 86 Wn.2d 44, 47, 541 P.2d 989 (1975)). The common law definition of "abandoned" appears in many land use related contexts. See State v. Kealey, 80 Wn. App. 162, 171, 907 P.2d 319 (1995) ("Property is abandoned when the owner intentionally relinquishes possession and rights in the property."); Wash. Sec. & Inv. Corp. v. Horse Heaven Heights, Inc., 132 Wn. App. 188, 196-97, 130 P.3d 880 (2006) ("The issue of whether there has been an abandonment at common law depends on the intention of the owner of the right-of-way. A right-of-way may be abandoned by unequivocal acts showing a clear intention to abandon. Mere nonuse of a portion of a railroad's easement does not itself constitute an abandonment.") (citing Neitzel v. Spokane Int'l Ry., 80 Wn. 30, 34-36, 141 P. 186 (1914); Jensen v. Dep't of Ecology, 102 Wn.2d 109, 115, 685 P.2d 1068 (1984) (abandonment under the common law must show the water user intended to abandon, and actually did relinquish, all or a portion of the water right); City of University Place v. McGuire, 144 Wn.2d 640, 652, 30 P.3d 453 (2001) (nonconforming use of

property deemed abandoned if the municipal authority shows an intent to abandon and an overt act or failure to act).

The common law definition of "abandoned" most analogous to conditional land use is that used in the context of nonconforming land use. A "nonconforming use" is one that was permitted under a prior zoning scheme that has since been prohibited. Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wn.2d 1, 6, 959 P.2d 1024 (1998).

In McGuire, a tract of land zoned for mining operations became nonconforming after the county passed zoning ordinances requiring permits for future mining operations. McGuire, 144 Wn.2d at 644. Several years later, a developer bought the land and intended to mine a section for fill material. McGuire, 144 Wn.2d at 646. The city denied the developer's request to mine, finding the former owner abandoned the mining use because no mining operations previously occurred in that particular area of the property. McGuire, 144 Wn.2d at 645-46. While the city's municipal code did not define the term "abandoned," the Supreme Court applied the two-prong common law definition of the word—" '(a) [a]n intention to abandon; and (b) an overt act, or failure to act.' " McGuire, 114 Wn.2d at 652 (quoting Van Sant v. City of Everett, 69 Wn. App. 641, 648, 849 P.2d 1276 (1993)).

Tateuchi argues that nonconforming use case law is distinguishable because their challenge here is to a conditional use. They claim that nonconforming uses are vested property rights entitled to greater protection under the law than conditional limited uses. But Tateuchi's argument is not

10

persuasive.  While nonconforming uses "are vested property rights which are protected," they are also disfavored, and the policy of zoning legislation is to phase out a nonconforming use.  Van Sant, 69 Wn. App. at 649; Christianson v. Snohomish Health Dist., 133 Wn.2d 647, 663, 946 P.2d 768 (1997), abrogated on other grounds by Yim, 194 Wn.2d at 682; Anderson v. Island County, 81 Wn.2d 312, 323, 501 P.2d 594 (1972); Open Door Baptist Church v. Clark County, 140 Wn.2d 143, 150, 995 P.2d 33 (2000).  "[U]nless their continuation is necessary to avoid injustice, the nonconforming use will be prohibited."  Choi v. City of Fife, 60 Wn. App. 458, 462, 803 P.2d 1330 (1991) (citing Andrew v. King County, 21 Wn. App. 566, 586 P.2d 509 (1978)).

Tateuchi also points to the language of the BLUC nonconforming use ordinance, arguing that it shows the City's intent to treat revocation of nonconforming use status differently than revocation of a conditional use.  While the conditional use ordinance BLUC 20.30B.170(B)(1) allows revocation on a showing of abandonment alone, a nonconforming use may be revoked only if the use is "discontinued . . . with the intention of abandoning that use."  BLUC 20.25A.040(A)(2).  Tateuchi argues that when a legislative body uses different words or terminology in different parts of a statute, it intends a different meaning.[13]

Even so, when " 'the legislature uses a term well known to the common law, it is presumed that the legislature intended [it] to mean what it was understood to mean at common law.' "  Ralph, 182 Wn.2d at 248 (Jones, 86 Wn.2d at 47).  The hearing examiner's conclusion that the term "abandoned" in

---

[13] See State v. Roggenkamp, 153 Wn.2d 614, 625-26, 106 P.3d 196 (2005).

11

BLUC 20.30B.170(B)(1) means an overt act and an intent to abandon was not an erroneous interpretation of the law.

## II. Evidence of Abandonment

Tateuchi claims KDC abandoned its helistop because it did not use the rooftop for helicopter takeoffs or landings over the course of a 12-month period. We disagree.

A party seeking revocation of a land use permit bears the burden of proving that a landowner abandoned its permitted use. Skamania County v. Woodall, 104 Wn. App. 525, 540, 16 P.3d 701 (2001). "But when an ordinance establishes a set time beyond which a . . . use cannot remain unused without being forfeited, the burden shifts back to the owner to prove lack of intent to abandon." Miller v. City of Bainbridge Island, 111 Wn. App. 152, 164, 43 P.3d 1250 (2002). Here, Tateuchi bears the burden to show that KDC abandoned its use of the CUP for "a period of at least one year." BLUC 20.30B.170(B)(1). The burden then shifts to KDC to produce objective evidence it did not intend to abandon the use.

BLUC 20.50.032 defines "land use" as "[t]he use to which an area of land, or building thereon, is put; human activity taking place thereon."[14] The City granted KDC a CUP to use the rooftop of the Bellevue Place Bank of America Building as a helistop. A "heliport" is "an area of land or water or a structural surface which is used as a permanent facility for the landing and takeoff of

---

[14] A semicolon is used to show a stronger separation between the parts of a sentence than does a comma. Dep't of Labor & Indus. v. Slaugh, 177 Wn. App. 439, 448, 312 P.3d 676 (2013). A semicolon separates phrases, clauses, or enumerations of almost equal importance, especially when such phrases or clauses contain commas within themselves. Slaugh, 177 Wn. App. at 448.

helicopters," and a "helistop" is "the same as a heliport, except that no refueling, maintenance, repairs or storage of helicopters is permitted." BLUC 20.50.024. Under the plain language of BLUC 20.50.024, KDC is using the land as a helistop if the land operates as a permanent facility for the landing and takeoff of helicopters. We conclude the record establishes that KDC has been maintaining a "fully operational" permanent facility for the landing and takeoff of helicopters continually since the CUP issued.

In Rosema v. City of Seattle, 166 Wn. App. 293, 299, 269 P.3d 393 (2012), homeowners disputed whether their structure or a portion of their structure was being used for the use allowed by the most recent permit for a period of more than 12 consecutive months under the Seattle Municipal Code. Neighbors alleged that the owners abandoned the permitted use of the home—a duplex—because they did not use the basement unit as a separate household for over a decade. Rosema, 166 Wn. App. at 296-97. We concluded that "failure to use the basement unit of their property to house an independent household" was not an overt act of abandonment or evidence of "discontinued interest" in use because the owners "maintain[ed] the structural capability to do so." Rosema, 166 Wn. App. at 300-01.[15]

Here, the City's restrictions on helicopter activity prevent KDC from currently using its helistop to receive flights. But a "temporary cessation" does not equate with "abandonment." Andrew v. King County, 21 Wn. App. 566, 571, 586 P.2d 509 (1978) (citing 8A E. MCQUILLIN, THE LAW OF MUNICIPAL

---

[15] The owners maintained a separate entrance, kitchen, and address for the unit. Rosema, 166 Wn. App. at 296.

CORPORATIONS § 25.196 (3d ed. rev. 1976)).  Like the basement unit in Rosema,

KDC has maintained the "structural capability" of the land to operate as a

permanent facility for helicopters if flights can lawfully resume.  Rosema, 166 Wn.

App. at 300.  KDC constructed the facility, established the necessary

communication systems, continues to comply with FAA regulations, and submits

biannual reports to the City attesting that the helistop remains "fully operational."

Tateuchi argues that the helistop must actively receive helicopter flights to

be operational because the BLUC contemplates "human activity taking place" on

the land.  BLUC 20.50.032.  But the "human activity" required to maintain the

operational status of a heliport consists of more than aircraft landing and taking

off.  The "human activity" at the KDC helistop includes those activities necessary

to comply with City building code provisions and FAA regulations, constructing

and maintaining operational communications systems, and the biannual filing of

usage reports.[16]

Substantial evidence supports the hearing examiner's conclusion that

KDC did not abandon its use of the rooftop as a helistop, and the decision is not

a "clearly erroneous application of the law to the facts."  RCW 36.70C.130(1)(d).

### OPMA

Tateuchi argues the trial court erred in granting the City's motion to

dismiss the OPMA claim under CR 12(b)(6).  They assert that the Council

violated the OPMA when it discussed their appeal from the hearing examiner's

decision in a closed-door executive session.  We disagree.

---

[16] These acts are also objective manifestations of KDC's intent not to abandon the helistop.

14

Under CR 12(b)(6), a trial court may dismiss a complaint if it fails "to state a claim upon which relief can be granted." State ex rel. Pub. Disclosure Comm'n v. 119 Vote No! Comm., 135 Wn.2d 618, 623, 957 P.2d 691 (1998). Dismissal is appropriate only where "it appears beyond doubt that the plaintiff cannot prove any set of facts which would justify recovery." Tenore v. AT&T Wireless Servs., 136 Wn.2d 322, 330, 962 P.2d 104 (1998). When deciding whether to dismiss under this standard, the court assumes all the plaintiff's factual allegations are true and "may consider hypothetical facts supporting the plaintiff's claims." Kinney v. Cook, 159 Wn.2d 837, 842, 154 P.3d 206 (2007).

We review dismissal under CR 12(b)(6) de novo as a question of law. West v. Seattle Port Comm'n, 194 Wn. App. 821, 825, 380 P.3d 82 (2016). While we presume that all facts alleged in the complaint are true, we "are not required to accept the complaint's legal conclusions as true." West v. Wash. Ass'n of County Officials, 162 Wn. App. 120, 128, 252 P.3d 406 (2011).

"The legislature enacted the OPMA as part of a nationwide effort to make government affairs more accessible and transparent." West, 162 Wn. App. at 131 (citing LAWS OF 1971, ch. 250).

> The OPMA declares that the governing bodies of "all public commissions, boards, councils, committees, subcommittees, departments, divisions, offices, and all other public agencies" are to take their actions and conduct their deliberations openly.

West, 162 Wn. App. at 131 (quoting RCW 42.30.010). But RCW 42.30.140(2) exempts "[t]hat portion of a meeting of a quasi-judicial body which relates to a quasi-judicial matter between named parties as distinguished from a matter having general effect on the public or on a class or group." We determine

15

whether an action is quasi-judicial by applying a four-part test: (1) whether a court could have been charged with the decision; (2) whether the courts historically have performed that action; (3) whether the action involves applying the law to particular facts for purposes of determining liability; and (4) whether the action is similar to the ordinary business of the courts, rather than that of legislators or administrators. Wash. Fed'n of State Emps. v. Pers. Bd., 23 Wn. App. 142, 145-46, 594 P.2d 1375 (1979).

BLUC 20.35.100, entitled "Process I: Hearing Examiner quasi-judicial decisions," governs appeals from City land-use decisions. Under the ordinance:

> The decision of the Hearing Examiner on a Process I application is appealable to the City Council. The City Council action deciding the appeal and approving, approving with modifications, or denying a project is the final City decision on a Process I application.

BLUC 20.35.100(C).

As directed by BLUC 20.35.100, the Council's actions here mirrored judicial appellate review, applying the law to specific facts and using legal standards of review. Historically, these functions are reserved to our courts. Indeed, the evidence and argument provided to the Council were nearly identical to that relied on by Tateuchi later in the superior court. Acting in that capacity, the Council adjudicated a dispute between specific parties; and its decision implicated only KDC's interest in the CUP, not the public at large. This action is more like the ordinary business of the courts than that of legislators.

Tateuchi argues that the Council acted as legislators because its decision impacts helicopter activity in heavily populated areas, which implicates public safety concerns. But the Council did not address the public safety issue in

16

executive session. They made that legislative decision in public session in 2011 as part of the CUP application process. The superior court did not err in concluding that the City was acting in a quasi-judicial capacity when it considered in executive session Tateuchi's application to revoke the CUP. The court properly dismissed the OPMA claim.

Attorney Fees

KDC and the City request attorney fees on appeal. RCW 4.84.370(1)[17] authorizes attorney fees

> to the prevailing party or substantially prevailing party on appeal before the court of appeals or the supreme court of a decision by a county, city, or town to issue, condition, or deny a development permit involving a site-specific rezone, zoning, plat, conditional use, variance, shoreline permit, building permit, site plan, <u>or similar land use approval or decision</u>.

And we may award fees to a county, city, or town if its decision was " 'upheld at superior court and on appeal.' " <u>Durland v. San Juan County</u>, 182 Wn.2d 55, 76, 340 P.3d 191 (2014) (quoting RCW 4.84.370(2)). The fee award is limited to proceedings before the Court of Appeals or Supreme Court. <u>Baker v. Tri-Mountain Res., Inc.</u>, 94 Wn. App. 849, 854, 973 P.2d 1078 (1999).

Tateuchi objects to any fee award because their appeal was not from a decision "to issue, condition, or deny a development permit" under RCW 4.84.370(1), but the denial of an application to revoke such a permit. But RCW 4.84.370(1) authorizes fee awards to prevailing parties from decisions to issue, condition, or deny permits, or a "similar land use approval or decision." A "land

---

[17] Emphasis added.

use decision" includes

> [a]n interpretative or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules regulating the improvement, development, modification, maintenance, or use of real property.

RCW 36.70C.020(2)(b).

Tateuchi appealed the City's denial of the application to revoke a CUP—a "similar land use" decision. RCW 4.84.370(1). The City and KDC prevailed in all forums below[18] and are the prevailing parties on this appeal. They are entitled to a fee award subject to compliance with RAP 18.1.

We affirm the orders denying Tateuchi's land use petition and dismissing the OPMA claim under CR 12(b)(6).

_____, J

WE CONCUR:

_____, J          _____, J.

---

[18] Tateuchi claims that because she prevailed on a procedural question under a separate cause of action in a prior judicial proceeding, the City and KDC were not the prevailing parties in every forum below. RCW 4.84.370(1)(b). This misinterprets the statute because the decision before us on appeal does not include these unrelated events.