FILED
8/12/2024
Court of Appeals
Division I
State of Washington

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MADISON ESTATES INVESTMENTS LIMITED PARTNERSHIP, a Washington limited partnership,<br><br>        Respondent,<br><br>        v.<br><br>MADISON ESTATES LOT 5 INVESTMENTS, LLC, a Washington limited liability company, and CITY OF SEATTLE, a municipal corporation,<br><br>        Appellants. | No. 85733-9-I<br>(Consolidated with No. 857347)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

FELDMAN, J. — We are asked in this appeal to review a decision of the Seattle Department of Construction and Inspections (the City) to issue a building permit to Madison Estates Lot 5 Investments, LLC (LOT5) for the construction of a single-family home in a Seattle neighborhood known as "Madison Estates." Madison Estates Investments Limited Partnership, LLC (MELP), an entity governed by LOT5's neighbor, filed a petition under the Land Use Petition Act (LUPA) challenging the City's decision. It contends that the decision should be reversed because a small body of water on LOT5's property, referred to here as the "Pond," is an "environmentally critical area" (ECA) under Seattle Municipal

Code (SMC) chapter 25.09. Because MELP has not established that it is entitled to relief under LUPA, we reverse the superior court's order granting MELP's LUPA petition and remand the matter to the superior court to dismiss the petition.

I

In 1916, the Army Corps of Engineers created a channel between Lake Washington and Lake Union. Today, that channel is known as the Montlake Cut. The creation of the Montlake Cut lowered the water level of Lake Washington by approximately 9 feet, exposing the area that is currently known as Madison Estates. In the late 1950s and early 1960s, the City and nearby property owners extensively developed the area. This included importing over 29,700 cubic yards of fill to the site. As a result, most of the site that comprises Madison Estates was filled prior to 1970, except for a small area where the Pond exists today. That small area then filled with stormwater from the newly elevated areas, creating the Pond that is the central focus of this appeal.

In 1989, MELP purchased Madison Estates and thereafter applied for a master use permit to subdivide the property into nine lots. Pursuant to the State Environmental Policy Act, ch. 43.21C RCW (SEPA), the City issued a determination of non-significance (DNS) for the master use permit, meaning that the City found no significant adverse environmental impacts stemming from the proposed subdivision. As a condition of the DNS, the City required MELP to record a 25-foot native vegetation buffer area around the Pond on the final recorded short plat where structures would not be permitted. Because MELP applied for the master use permit prior to the City's adoption of SMC chapter 25.09, the City did not determine whether the Pond was an ECA under the city code. MELP later

- 2 -

added a rubber liner, pump, and waterfall feature to the pond.

In 2004, LOT5 purchased Lot 5 within Madison Estates. Lot 5 includes a portion of the Pond. In 2020, LOT5 filed an application for a building permit to construct a single-family home on the property. To comply with the conditions of the DNS attached to the City's master use permit, LOT5's building plans do not encroach on the Pond or the 25-foot buffer area around the Pond. MELP opposed the project and sought to influence the permitting process. It repeatedly contacted the responsible decisionmakers at the City and submitted documents in support of its position that the Pond is an ECA under chapter 25.09 SMC and the proposed construction is inconsistent with that designation.

Because MELP actively opposed the project, the City applied greater scrutiny to the proposal and reviewed significantly more wetland information than it had for other similar applications. After two years of review, the City concluded that the Pond met the criteria to be excluded from the ECA designation under SMC 25.09.012(C)(2)(a). As discussed more fully below, SMC 25.09.012(C)(2)(a) states that "Wetlands do not include . . . [1] those artificial wetlands intentionally created [2] from nonwetland sites and [3] not used for mitigation . . . ." Tracking the elements of SMC 25.09.012(C)(2)(a), the City determined that the Pond (1) is artificial and intentionally created, (2) was created from a nonwetland site and (3) is not used for mitigation. It therefore issued the requested building permit despite MELP's staunch opposition.

MELP filed a LUPA petition in superior court challenging the City's decision. The court allowed the parties to conduct discovery and supplement the record for

judicial review under RCW 36.70C.120(3).[1]  Similar to its prior assertions in the permitting process, MELP argued in the superior court that the Pond does not satisfy any of the three elements of SMC 25.09.012(C)(2)(a) and, as a result, is an ECA under SMC chapter 25.09.  Following a hearing on MELP's LUPA petition, the superior court granted the petition and reversed the City's decision approving LOT5's building permit.  This timely appeal followed.

II

The Washington legislature enacted LUPA in 1995 to replace the writ of certiorari as the exclusive means of appealing a local land use decision, such as the City's permitting decision here.  *Durland v. San Juan County*, 182 Wn.2d 55, 64, 340 P.3d 191 (2014); RCW 36.70C.030.  "In reviewing a land use decision, we stand in the same position as the superior court."  *Tateuchi v. City of Bellevue*, 15 Wn. App. 2d 888, 895, 478 P.3d 142 (2020).  Like the superior court, we may grant relief from a local land use decision under LUPA "only if the party seeking relief has carried the burden of establishing that one of the six standards listed in RCW

---

[1] RCW 36.70C.120 states in relevant part:

> (1) When the land use decision being reviewed was made by a quasi-judicial body or officer who made factual determinations in support of the decision and the parties to the quasi-judicial proceeding had an opportunity consistent with due process to make a record on the factual issues, judicial review of factual issues and the conclusions drawn from the factual issues shall be confined to the record created by the quasi-judicial body or officer, except as provided in subsections (2) through (4) of this section.
> . . . .
> (3) For land use decisions other than those described in subsection (1) of this section, the record for judicial review may be supplemented by evidence of material facts that were not made part of the local jurisdiction's record.

The superior court evidently concluded that subsection (3) applies here.  None of the parties to this appeal argues otherwise.

- 4 -

36.70C.130(1) has been met." *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 175, 4 P.3d 123 (2000). The six standards are:

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
>
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
>
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
>
> (d) The land use decision is a clearly erroneous application of the law to the facts;
>
> (e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
>
> (f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1). Similar to *Wenatchee Sportsmen*, LUPA also states, "The court may grant relief only if the party seeking relief has carried the burden of establishing that one of the standards set forth in (a) through (f) of this subsection has been met." *Id.*

Here, MELP seeks relief under RCW 36.70C.130(1)(c), (d), and (e). Regarding subsection (c), the substantial evidence standard requires that "there must be sufficient quantum evidence in the record to persuade a reasonable person that the declared premise is true." *Wenatchee Sportsmen*, 141 Wn.2d at 176. Regarding subsection (d), whether the City erroneously interpreted the law "is a question that we review de novo." *Tateuchi*, 15 Wn. App. 2d at 896 (citing *Phoenix Dev., Inc. v. City of Woodinville*, 171 Wn.2d 820, 828, 256 P.3d 1150 (2011)). Further, a land use decision is "clearly erroneous" only when the

reviewing court "is 'left with the definite and firm conviction that a mistake has been committed.'" *Cougar Mountain Assocs. v. King County*, 111 Wn.2d 742, 747, 765 P.2d 264 (1988) (quoting *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 69, 578 P.2d 1309 (1978)). Lastly, whether the City exceeded its authority, so as to justify relief under subsection (e), presents a question of law that we review de novo. *Phoenix Dev.*, 171 Wn.2d at 828.

While the general principles outlined above are not in dispute, the parties disagree as to how we should view the evidence in deciding whether MELP is entitled to relief under LUPA. In *Cingular Wireless, LLC v. Thurston County.*, 131 Wn. App. 756, 768, 129 P.3d 300 (2006), the court recognized that "[o]ur deferential review" under LUPA "requires us to consider all of the evidence and reasonable inferences in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority." Citing this decision, MELP claims we should view the facts and inferences in its favor because it prevailed in the superior court. This argument easily fails because the superior court did not exercise fact finding authority; to the contrary, Washington courts have repeatedly held, "A superior court hearing a LUPA petition *acts in an appellate capacity* and has only the jurisdiction conferred by law." *Durland*, 182 Wn.2d at 64 (emphasis added). Washington law is equally clear that "appellate 'courts do not . . . find facts.'" *Yorkston v. Whatcom County.*, 11 Wn. App. 2d 815, 831, 461 P.3d 392 (2020) (quoting *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009)). Thus, the superior court's order granting MELP's LUPA petition does not set forth any specific findings of fact and, instead, merely states, "the Land Use Petition is GRANTED and the [City's] Decision is REVERSED."

Because the superior court did not, and could not, exercise fact-finding authority here, we are not required to view the facts and inferences in MELP's favor.[2]

Contradicting MELP's argument, both LOT5 and the City assert that we should view the facts and inferences in LOT5's favor because it prevailed before the City, which granted its building permit application. This argument is well taken. The record shows that the City, prompted by MELP's submissions, considered the information provided by both LOT5 and MELP in the permitting process and ultimately concluded that the Pond is not an ECA under SMC chapter 25.09. Additionally, we generally "recognize and defer to the administrative agency's environmental expertise." *Wild Fish Conservancy v. Dep't of Fish & Wildlife*, 198 Wn.2d 846, 866, 502 P.3d 359 (2022). LOT5 and the City's argument that we should view the facts and inferences in LOT5's favor is thus consistent with both the administrative record and applicable legal principles. Nonetheless, we need not decide this issue because even without considering the facts and inferences in

---

[2] Relying on due process principles, MELP also asserts that "Stakeholders in a land use decision have a constitutional right to present evidence and have that evidence weighed by a competent fact finder." This argument easily fails. First, MELP has not shown that it possesses a "legitimate claim of entitlement" under the law, as required to establish a due process violation. *Durland*, 182 Wn.2d at 69 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701 (1972)). MELP has not cited any legal authority establishing that a neighbor has a constitutionally protected property interest in the denial of a building permit, and our supreme court rejected a similar claim in *Durland*. *Id.* at 72-75 (city code does not give neighbors a claim of entitlement to their views of the water). Second, MELP has not shown that the administrative process and available remedies were constitutionally inadequate. Due process requires that a person be provided with notice and an opportunity to be heard before the government can deprive them of their life, liberty, or property. *Samuel's Furniture Inc. v. Dep't of Ecology*, 147 Wn.2d 440, 462-63, 54 P.3d 1194 (2002); U.S. CONST. amend. XIV, § 1. Both before and after the City approved LOT5's building permit, MELP was allowed to (and did) communicate with the pertinent decisionmakers and submit evidence, including sworn declarations and historical documents, to support its position that the Pond is an ECA under chapter 25.09 SMC. The superior court indicated in its ruling that it "heard oral arguments of counsel for the parties" and "reviewed the briefing, exhibits, and other documents in the court file" before issuing its decision (which was favorable to MELP). On this record, MELP has not established a violation of its constitutional rights.

LOT5's favor, MELP has not met its burden to show, as it must, that it is entitled to relief under LUPA. We turn to that issue below.

III

Tracking the three elements of SMC 25.09.012(C)(2)(a), MELP claims that the Pond (1) is neither artificial nor intentionally created, (2) was not created from a nonwetland site, and (3) is used for mitigation. Its first two arguments are premised on the substantial evidence standard in RCW 36.70C.130(1)(c), and its third is premised on the clearly erroneous application of law standard in RCW 36.70C.130(1)(d). Each argument fails.

A

Contrary to MELP's first argument, the City's determination that the Pond is artificial and intentionally created is supported by evidence that is substantial when viewed in light of the whole record before the court.

The City's wetland expert and permit reviewer, Christy Carr, concluded that the Pond was artificial and intentionally created. Carr relied on a report created by a consultant of Admiralty Development Corporation (Admiralty), a previous owner of Madison Estates. In 1989, Admiralty sought to fill the Pond to "provide driveway access to two lots." To do this, Admiralty hired a consultant, Construction and Development Services (CDS), to submit an application to the Army Corps of Engineers for a permit to fill the Pond. CDS prepared a report, which states that the Pond "did not exist prior to the landfill and was created by surface drainage flowing into a lower lying area next to one of the existing houses." Relying on CDS's report, Carr states:

> Based on the documents in the record and those attached to this declaration, I conclude that the wetland that is now referred to as the Pond was intentionally created by the placement of fill around the location of the Pond in the 1960's. The fill obstructed the flow of local surface water downslope which resulted in the collection of surface water in that location. Alteration of surface water drainage is a reasonably expected consequence of filling activity.

According to Carr, the filling activities that occurred in Madison Estates—particularly the placement of fill around the Pond—led to the Pond's intentional creation. This is "a sufficient quantum of evidence . . . to persuade a reasonable person that" the Pond is artificial and intentionally created. *Wenatchee Sportsmen*, 141 Wn.2d at 176.

In response to the City's evidence and analysis, MELP relies on the analysis of its consultant, Dr. Sarah Cooke, who asserts that the Pond is neither artificial nor intentionally created. Cooke relies on the reports she created in the early 1990s to support her opinion. As a consequence of MELP removing vegetation from wetlands in Madison Estates without a permit in 1991, the City required MELP to hire a third-party reviewer to "conduct[] an on-site evaluation to determine the potential impacts to wetlands and the buffers from [the] mechanized clearing activities [that occurred] on the property." Cooke performed that work. She also assisted MELP by creating a mitigation plan when it applied for its master use permit to subdivide Madison Estates in 1989.

Based on the reports that she prepared when performing the above work, Cooke asserts that the Pond was not intentionally created and predates the filling activities that occurred on Madison Estates. She states:

> While the western portion of the site had been degraded by a long history of filling and illegal dumping, the wetland area in question was not filled and was part of an old, naturally occurring wetland, as likely

were the surrounding areas before they were filled. There was still a viable herbaceous plant community as well as native willows and black cottonwood trees in the wetland and the ditch that continued to the lakeshore.

While Cooke's opinion supports MELP's argument, it does not negate or fatally undermine the substantial evidence that the City and Carr relied upon, which shows that the Pond was intentionally created by the filling activities that took place in the 1960s.

Next, MELP argues that the CDS report relied upon by Carr also indicates that the Pond was not intentionally created. MELP relies on the following passage to support its assertion:

When the property owners realized that the landfill trapped surface drainage, they dug a drainage ditch between the low area [which became the Pond] and [Lake Washington].

MELP argues that this "characterization suggests that [the Pond]'s formation was an accident, the 'unexpected by-product' of the 'intentional act' of filling." But the report also states:

The elevation of the ditch is higher than either the interior wetland [(the Pond)] or the lake, however. Water would only flow out through the ditch when the wetland area is flooded. There has been no standing water in . . . either the interior wetland or the ditch since we first observed the site in May of 1989.

As this excerpt confirms, the ditch allows excess drainage to exit the Pond only when the Pond is "flooded." This shows the property owners' intent to utilize the Pond to collect and retain surface drainage. Contrary to MELP's argument, the CDS report supports the City's determination that the Pond was intentionally created as required to be exempt from regulation as an ECA under SMC 25.09.012(C)(2)(a). Viewing the evidence "in light of the whole record before the

court" (RCW 36.70C.130(1)(c)), substantial evidence supports the City's determination that the Pond is artificial and intentionally created.

B

Nor has MELP established that substantial evidence does not support the City's determination that the Pond was created from a nonwetland site.

To establish that the Pond was created from a nonwetland site, Carr relied on a report created by MELP's consultant, Dames & Moore. Dames & Moore created its report in 1992 to support MELP's environmental review of its proposed subdivision of Madison Estates. Carr explained that to determine whether a site qualifies as a wetland one must consider "three environmental parameters: hydrology, soil, and vegetation." The Dames & Moore report describes the hydrology of the Pond and states that "this part of the site dries out during the summer" and "the source of the shallow ground water is local surface runoff that infiltrates the surface soils."

Based on the Dames & Moore report and the topography of the site, Carr concluded:

> In my opinion, based on this site characterization and the topography of the site, the local surface runoff would have continued downslope toward Lake Washington prior to the placement of fill and would not have been present in the location of the Pond for a sufficient frequency or duration to support development of wetland vegetation and soil conditions. Thus, it is my opinion that the site of the Pond was not a wetland following the lowering of Lake Washington and prior to the placement of the fill.

The information identified and analyzed by Carr is a "sufficient quantum of evidence . . . to persuade a reasonable person that" the Pond was created from a nonwetland site. *Wenatchee Sportsmen*, 141 Wn.2d at 176.

- 11 -

MELP again relies on Cooke's contrary opinion that the Pond was created from a wetland site. Cooke relies on the presence of "peat soils" she found in the Pond to conclude that it was created from a wetland site. She states:

> At that time (1991), I determined [the Pond] (called Wetland A) contained thick old peat deposits and emergent and shrub vegetation. This wetland was clearly very old based on the depth of the peat, and in my opinion, these peat soils greatly predated the lowering of Lake Washington and were likely hundreds, if not thousands, of years old. This supports my conclusion that these were native, original soils, and not fill from subsequent decades of activity.

But as Carr notes in response, "[t]he presence of peaty mucks . . . would not, by itself, establish that the site of the Pond was a wetland following the lowering of Lake Washington and prior to the fill activities in the 1960s." Carr also explains that "hydric soils may persist for decades following alteration of hydrology that will render an area a non-wetland." Thus, Cooke's finding that the Pond contains old peat deposits is not inconsistent with the City's determination that the Pond was created from a nonwetland site.

Next, MELP argues that because the Army Corps of Engineers determined in 1991 that the Pond was within its jurisdiction and declined to apply "any of the substantially related exemptions" under the Clean Water Act, this shows that the Pond was created on a wetland site. But none of the exemptions cited by MELP applies to wetlands that are intentionally created from nonwetland sites. *See* 33 C.F.R. 328.3(b)(1)-(8). Further, there is no evidence in the record that the Army Corps of Engineers made any specific determination that the Pond was created from a wetland site, let alone determined that it is an ECA under SMC chapter 25.09 (which had not yet been enacted). Accordingly, the Army Corps of

Engineers' determination does not support MELP's argument.

Finally, MELP argues that the following exhibit, a 1936 aerial photograph, supports Cooke's opinion that the Pond was created from a wetland site:



MELP-SUPP-000685

But Carr analyzed this photo and concluded that it is inconclusive and shows no clear signature of a wetland site on what today is Lot 5 of Madison Estates. Here too, the photograph does not negate or fatally undermine the substantial evidence that the City and Carr relied upon, which shows that the Pond was created from a nonwetland site. MELP has failed to show, as it must, that the City's determination that the Pond was created on a nonwetland site is not supported by substantial evidence in light of the whole record before the court.

C

Relying on RCW 36.70C.130(1)(d), MELP next argues that the City's land-use decision was a clearly erroneous application of the law to the facts because

- 13 -

the Pond does not meet the final requirement of SMC 25.09.012(C)(2)(a), which is that it is "not used for mitigation." MELP reasons that the City's mitigation measures imposed pursuant to SEPA as a condition of the master use permit render the Pond "used for mitigation" and, thus, the Pond is an ECA under SMC chapter 25.09. This argument also fails.

Courts interpret local ordinances the same as statutes. *R. Thoreson Homes, LLC, v. Prudhon*, 197 Wn. App. 38, 41, 386 P.3d 1139 (2016). When construing statutes, the court's goal is to ascertain and carry out the legislature's intent. *State v. A.G.S*, 182 Wn.2d 273, 277, 340 P.3d 830 (2014). Additionally, "When interpreting a statute, the court should read it in its entirety, and each provision must be harmonized with other provisions . . . ." *Jackson v. Fenix Underground, Inc.*, 142 Wn. App. 141, 145-46, 173 P.3d 977 (2007). And lastly, we must also "avoid reading statutes in ways that will lead to absurd or strained results." *Id.* at 146.

Viewing the city code as a whole, the City defines ECAs to include wetlands that meet the following criteria:

C. Wetlands. Wetlands are those areas that are inundated or saturated by surface water or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

1. Wetlands generally include:

   a. Swamps, marshes, bogs, and similar areas; and

   b. Those wetlands intentionally created from nonwetland or former wetland areas to mitigate conversion of wetlands.

2. Wetlands do not include:

- 14 -

a. Those artificial wetlands intentionally created from nonwetland sites and not used for mitigation . . . .

SMC 25.09.012(C). Viewed as a whole, the provision defines wetlands to include those wetlands that are "intentionally created . . . to mitigate conversion of wetlands" and then excludes from the ECA designation artificial wetlands that are "intentionally created from nonwetland sites and not used for mitigation." *Id.*

Interpreting these provisions together, we conclude that the phrase "not used for mitigation" in SMC 25.09.012(C)(2)(a) refers back to the language in the previous provision: "Wetlands generally include . . . [t]hose wetlands intentionally created . . . to mitigate the conversion of wetlands." SMC 25.09.012(C)(1)(b). Thus, a wetland that is "not used for mitigation" is a wetland that is not created "to mitigate the conversion of wetlands." *Id*. Conversely, those wetlands that are "intentionally created . . . to mitigate the conversion of wetlands" are "used for mitigation." SMC 25.09.012(C)(2)(a). This interpretation harmonizes the two related provisions by enabling the phrase "not used for mitigation" to provide clear direction on what wetlands are excluded from the ECA designation under SMC 25.09.012(C)(2)(a). Accordingly, the City did not clearly misapply the law to the facts when it concluded that the Pond was "not used for mitigation" because the Pond was not "intentionally created . . . to mitigate the conversion of wetlands." SMC 25.09.012(C)(2)(a); SMC 25.09.012(C)(1)(b).

Notwithstanding the above analysis, MELP argues that even if "the City's interpretation is valid, mitigation imposed under SEPA should control over SMC 25.09.012(C)(2)(a)." MELP reasons that the City's interpretation of SMC 25.09.012(C) would "eviscerate the very SEPA mitigation that the City imposed as

a condition for allowing Lots 5 and 6 to be created at all." But MELP fails to identify any of the mitigation measures imposed pursuant to SEPA under the master use permit that would be "eviscerated" by the City's approval of LOT5's building permit. As noted previously, MELP can satisfy the clearly erroneous standard in RCW 36.70C.130(1)(d) only if we are "'left with the definite and firm conviction that a mistake has been committed.'" *Cougar Mountain Assocs.*, 111 Wn.2d at 747 (quoting *Polygon Corp.*, 90 Wn.2d at 69). MELP's argument that the City misapplied SMC 25.09.012(C)(2)(a) to the facts at issue in determining that the Pond is "not used for mitigation" falls well short of that mark.

IV

Finally, relying on RCW 36.70C.130(1)(e), MELP argues that the City did not have the authority to issue the requested building permit because it was required to modify the Madison Estates short plat under RCW 58.17.215 "before the City can determine [the Pond] is not a regulated wetland." MELP reasons that because the Madison Estates short plat included mitigating measures to "enhance and preserve" the Pond pursuant to SEPA, the City was required to obtain an "approved short plat alteration or modification allowing for the determination that [the Pond] is no longer regulated under City Code." We disagree.

Because MELP applied for the master use permit prior to the City's adoption of SMC chapter 25.09, the City did not determine whether the Pond was an ECA under the city code when it granted MELP's master use permit. As a result, the City was not required to modify the Madison Estates short plat to conclude that the Pond was excluded from an ECA designation under SMC 25.09.012(C)(2)(a). Moreover, the City's decision that the Pond is excluded from the ECA designation

did not modify or alter any of the mitigation measures imposed under SEPA. To the contrary, despite MELP's entreaty that "[t]his case concerns the environmental stewardship of a wetland that [it] went to great lengths to protect and enhance," LOT5's proposed construction does not encroach on the Pond or the 25-foot buffer area recorded on the final recorded short plat. As with its other arguments, MELP has failed to show that it is entitled to relief under LUPA.

We reverse the superior court's order granting MELP's LUPA petition and remand the matter to the superior court to dismiss the petition for the reasons provided above.

_Feldman, J._

WE CONCUR:

_Birk, J._          _Brennan, J._