IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BOBBY KITCHEON and CANDANCE REAM, individually, and SQUIRREL CHOPS, LLC, a Washington limited liability company, | No. 85583-2-I |
| Respondents, | DIVISION ONE |
| Austin Rusnak, | UNPUBLISHED OPINION |
| Plaintiff, | |
| v. | |
| CITY OF SEATTLE, WASHINGTON, a municipal corporation, | |
| Petitioner. | |

COBURN, J. — Seattle faces a homelessness crisis. In one day in 2018, there were more than 12,000 individuals living unhoused across Seattle and its encompassing King County. Comparatively, a city report found there was a daily average of 18 shelter beds available in 2018. Data from the King County Regional Homelessness Authority shows that "the number of individuals experiencing homelessness exceeds the number of emergency shelter beds by a multiple of 2 to 1." Br. of Amici Curiae Lived Experience Coalition, et al., at 17 n.10. Our state legislature has found that "[d]espite laudable efforts by all levels of government ... the number of homeless persons in Washington is unacceptably high." RCW 43.185C.005.

The causes of the homelessness crisis are as varied as they are complex, including "volatile housing markets, uncertain social safety nets, colonialism, slavery, and discriminative housing practices." City of Seattle v. Long, 198 Wn.2d 136, 172, 493 P.3d 94 (2021); see also RCW 43.185C.005 (finding causes of homelessness to include, for example, a lack of accessible and affordable health care supports for physical health, mental illness, and chemical dependency). For various reasons, such as a lack of shelter beds and social support networks, individuals who are unhoused sometimes set up encampments on public property. See, e.g., Br. of Amici Curiae Lived Experience Coalition, et al., at 19-20; Br. of Amici Curiae Northwest Justice Project, et al., at 30. For individuals who are unhoused, encampments may "help bridge the gap between survival and a path toward more permanent and supportive housing solutions." Br. of Amici Curiae Lived Experience Coalition, et al., at 4. At the same time, encampments can pose safety risks.

Since 2017, the City of Seattle has spent hundreds of millions of dollars to fund a range of programs to address the homelessness crisis, including prioritizing emergency and permanent housing options. "[T]o address public health, safety, and operational concerns related to unauthorized encampments on public property," the City of Seattle established an Encampment Abatement Program and developed rules to identify and assess encampments for removal. These include the Multi-Departmental Administrative Rules (MDAR) 17-01 and Finance and Administrative Services (FAS) Encampment Rule 17-01. These rules went into effect in April 2017.

This case centers around facial and as-applied state constitutional challenges to a part of the City's administrative rules regarding the removal of "encampments" from

public property. This discretionary review addresses the plaintiffs' challenge to only one specific portion of FAS 17-01, section 3.4. Section 3.4 defines "Obstruction." The rules allow city personnel to immediately remove "obstructions," including personal property, without advance notice or prior offer of alternative shelter. FAS 17-01, § 4.1-.7. At issue is the following emphasized portion of section 3.4:

> Obstruction means people, tents, personal property, garbage, debris or other objects related to an encampment that: <u>are in a City park or on a public sidewalk</u>; interfere with the pedestrian or transportation purposes of public rights-of-way; or interfere with areas that are necessary for or essential to the intended use of a public property or facility.

FAS 17-01, § 3.4 (emphasis added). For simplicity, we refer to the challenged portion of section 3.4 as the "in-a-park category."

> The rules define "encampment" as:

> [O]ne or more tent, structure, or assembly of camping equipment or personal property located in an identifiable area within the City of Seattle, which appears to a reasonable person as being used for camping. Encampments do not include sites a reasonable person would conclude are no longer in use for camping because remaining materials are garbage, debris, or waste.

FAS 17-01, § 3.2.

Plaintiffs here consist of two previously unhoused individuals, Bobby Kitcheon[1] and Candance Ream,[2] as well as a taxpayer plaintiff, Squirrel Chops, LLC. All plaintiffs claim that the in-a-park category facially violates privacy protections under article I,

---

[1] The City notes in their briefing that Kitcheon testified to his last name being spelled as "Kitchen," but does not provide a citation to the record on appeal. The plaintiffs' briefing does not address this potential discrepancy, and instead uses the "Kitcheon" spelling. We maintain the "Kitcheon" spelling consistent with what the parties used in their briefing.

[2] As stated below, individual plaintiffs Kitcheon's and Ream's claims against the City arise from periods during which they were living unhoused in Seattle. Kitcheon testified to living in an apartment, where he has been living since January 2022. Ream testified to moving into subsidized housing in late 2019 or early 2020 through a program she enrolled in while she was living in a tent "on the streets" of Seattle.

section 7 and the prohibition of cruel punishment under article I, section 14 of the Washington State Constitution.[3] Kitcheon and Ream also assert as-applied state constitutional challenges under the same provisions, and claim that the City committed conversion of their property.[4]

Both plaintiffs and the City filed summary judgment motions in King County Superior Court. Relevant to review, the trial court ruled that the in-a-park category violates both the privacy and cruel punishment provisions of the Washington State Constitution. The court also held that Kitcheon and Ream had standing to bring their as-applied claims. This court granted the City's request for discretionary review.

The City contends that (1) plaintiffs may not mount a partial facial challenge to section 3.4, (2) the in-a-park category does not violate privacy protections under article I, section 7 of the state constitution, (3) the in-a-park category does not violate the prohibition of cruel punishment under article I, section 14 of the state constitution, and (4) Kitcheon and Ream do not have standing to bring as-applied claims under article I, section 14. Finally, even if Kitcheon and Ream have standing, the City contends the individual plaintiffs fail to state a claim under article I, section 14.

First, as a threshold matter we hold that the plaintiffs' partial facial challenge to the in-a-park category is permitted. Second, it is undisputed that removal of obstructions in the in-a-park category can lead to city personnel accessing and reviewing the most personal property of the unhoused. FAS 17-01, § 3.5. The right to nondisclosure of intimate personal information is a protected privacy interest under article I, section 7.

_____

[3] Throughout this opinion, the individual and taxpayer entity plaintiffs are collectively referred to as the "plaintiffs" unless identified separately.
[4] The conversion claims are not at issue on review.

4

Wash. Pub. Emp. Ass'n v. Wash. State Ctr. for Childhood Deafness & Hearing Loss, 194 Wn.2d 484, 504, 450 P.3d 601 (2019) (WPEA) (citing O'Hartigan v. Dep't of Personnel, 118 Wn.2d 111, 117, 821 P.2d 44 (1991)). Applying a rational basis review, we hold that the indiscriminate and standardless removal of obstructions under the in-a-park category is not carefully tailored to meet a legitimate governmental goal and is thus facially unconstitutional under article I, section 7. Third, we hold the City's in-a-park category does not implicate punishment as contemplated under article I, section 14, and that Kitcheon and Ream do not otherwise have standing to assert claims that would trigger the protections of article I, section 14.

Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## FACTS

MDAR 17-01 allows city agencies, including the Parks and Recreation Department, Seattle Department of Transportation (SDOT), and FAS "to prohibit camping on property under their jurisdiction." MDAR 17-01, § 1.1, 4.0; FAS 17-01, § 2.1. The City's FAS 17-01 encampment removal rules establish uniform processes to address encampments on city property, including inspecting and prioritizing encampments for removal, conducting the actual removals, and storing personal property. In the event of a conflict between MDAR 17-01 and FAS 17-01, the FAS rules control. MDAR 17-01, § 4.1.

The City's FAS 17-01 administrative rules provide different criteria to assess encampments for removal and to dictate the manner in which encampments may be removed. Under FAS 17-01, unless an encampment is an obstruction or immediate

hazard, the City must provide notice at least 72 hours before removing the encampment and must provide encampment occupants with offers of alternative available shelter. §§ 4.1, 6.1-.3, 7.1. Alternatively, under the City's FAS 17-01 rules, an encampment that qualifies as an obstruction or immediate hazard may be removed immediately without written notice and without prior offers of shelter.[5] §§ 4.1-.2. The rules define an "immediate hazard" encampment as:

> [A]n encampment where people camping outdoors are at risk of serious injury or death beyond that caused by increased exposure to the elements or their presence creates a risk of serious injury or death to others; including but not limited to encampments at highway shoulders and off-ramps, areas exposed to moving vehicles, areas that can only be accessed by crossing driving lanes outside of a legal crosswalk, and landslide-prone areas.

FAS 17-01, § 3.3.

To be clear, plaintiffs challenge obstructions under FAS 17-01, section 3.4, which consist of "people, tents, personal property, garbage, debris or other objects related to an encampment" "in a City park or on a public sidewalk," and do not challenge obstructions that "interfere with the pedestrian or transportation purposes of public rights-of-way" or obstructions that "interfere with areas that are necessary for or essential to the intended use of a public property or facility."

Pertaining to the lack of notice necessary for obstruction encampment removals, the City's rules state:

> If an obstruction is observed and is to be immediately removed by City personnel observing the obstruction, a notice is not required to be affixed to the obstruction before its removal. If the obstruction is not immediately removed by the City personnel observing the obstruction, a

---

[5] In terms of potential notice, the City's rules state "[i]f the obstruction is determined to be under control of an individual present where the obstruction is observed, oral notice to immediately remove the obstruction shall, if reasonably possible, be given to the individual." FAS 17-01, § 4.3 (emphasis added).

6

notice shall be affixed to the obstruction by the City as soon as reasonably possible.

FAS 17-01, § 4.2.[6]

FAS 17-01 also provides for procedures related to prioritizing encampment removals, section 5.0; encampment removal and notice requirements, section 6.0; identifying or providing alternative shelter before removing non-obstructing encampments, section 7.0; outreach for encampment removals, section 8.0; and encampment site cleanup, section 9.0. However, these sections do not apply to removing obstructions and immediate hazards. FAS 17-01, § 4.1.[7]

City personnel conducting an encampment removal may "act as the complainant to request police action to exclude individuals from any City-owned or City-controlled property or to enforce the trespass laws of the City" or other laws under the City's traffic, street and sidewalk use, and criminal codes. MDAR 17-01, § 4.3.

From March 2017 through October 2018, the City removed 623 encampments, 254 of which were classified as "obstruction/hazard" encampments. See King County Cent. Blood Bank v. United Biologic Corp., 1 Wn. App. 968, 969, 465 P.2d 690 (1970) (holding that after summary judgment undisputed facts are treated as verities on appeal). A supervisor of city personnel conducting encampment removals testified that

---

[6] The remainder of FAS 17-01, § 4.2 states:
  The notice shall state: (1) the date the notice was posted; (2) that the obstruction must be immediately removed and is subject to removal by the City without further notice; (3) where any personal property removed by the City will be stored; and (4) how any stored personal property may be claimed by its owner.

[7] FAS 17-01, section 10.0 addresses post-encampment removal notice procedures. Section 10 does not apply to removing obstructions and immediate hazards. FAS 17-01, § 4.1. However, FAS 17-01, section 4.6 provides that "[u]pon removing an obstructing encampment, the City shall post a notice as provided for in Section 10."

96 percent of the encampment removals from October to December 2019 were exempt from the 72-hour notification requirement.

<u>Plaintiffs Bobby Kitcheon and Candace Ream</u>

Kitcheon's and Ream's claims in the present case arise from periods during which they were living unhoused in Seattle.

In his responses to the City's interrogatories, Kitcheon recounted various times from 2016 to 2019 that "the City removed an encampment where he lived and took his property." On or around June 11, 2019, Kitcheon testified, he was living in a park across the street from the I-90 bridge "that goes all the way to 23rd Avenue" where there were about "20 tents lined up." According to his testimony, Kitcheon and his wife came back from an appointment to find their belongings gone, including clothes, Kitcheon's work boots, food, cook stoves, and a generator. Kitcheon said, "[W]hen we came back, we see ... some people packing ... [and] [t]hey said SDOT came by and started taking people's stuff." Between June 19 and 23, 2019, Kitcheon lived in an encampment under the viaduct at Alaskan Way and Marion Street. He described his belongings "neatly stored" and "sectioned off" inside his tent. He returned to his encampment site to find the City removing his belongings without notice. Kitcheon testified that although he was able to save clothes, dog food, and a blanket, the City removed his tent, mattress, and carpet. On July 20, 2019, Kitcheon testified, he was living in Pioneer Square Park on the side of a sidewalk and returned to find his belongings being removed by the City without notice.

Kitcheon described two times in 2019 when city personnel threatened to "call the cops" on him if he tried to intervene by grabbing his own or another's belongings during

an encampment removal. Although Kitcheon testified he was threatened with arrest, it is undisputed that Kitcheon was never arrested or cited "for conduct directly related to unauthorized camping." Kitcheon also testified he never paid a fine for camping on city property, or was otherwise excluded from a park, and that city personnel never told him he could be cited or arrested for camping on city property.

Ream testified to multiple instances between 2017 and 2019 of the City removing her belongings from her tent sites, including taking and destroying her tents, pillows, sleeping bag, clothing, blood pressure pills, pots and pans, and other personal possessions. "It was like ... me going to somebody's house and taking all their stuff and throwing it in the trash." Ream explained she was unable to replace everything that the City threw away.

Ream testified she did not receive more than 15 or 30 minutes of warning prior to the City removing her property, and that she was never aware whether the encampment removal was categorized as an obstruction, immediate hazard, or otherwise. Ream recounted it was usually the police knocking on her tent to tell her to move: "It's usually the police, and then people come in a dump truck and throw all your stuff away that you don't get out." Ream said, "We lost everything like four or five times."

On June 27, 2019, Ream and her husband lived in a tent behind the Bread of Life Mission on Alaskan Way. After living there for three months, Ream testified they returned from a doctor's appointment to find the City had removed their tent. According to Ream, the City threw away their tent and most of their belongings. Ream, who has insulin-dependent diabetes, testified to the City removing her insulin and sugar checker equipment. After the removal, Ream recalled she and her husband "were living under

9

tarps after they threw our tent away." It is undisputed that Ream was never arrested or cited for "unauthorized camping" and Ream testified she was never fined or prosecuted for camping on city property.

Procedural History

On October 1, 2019, the plaintiffs[8] filed a complaint for declaratory relief and monetary damages against the City. All plaintiffs requested "[a] declaratory judgment that the City's policies, practices, and conduct" violate article I, sections 7 and 14 of the Washington State Constitution. Kitcheon and Ream alleged the City's removal of their tents and belongings violated their state constitutional rights to privacy and against cruel punishment, and that the City committed conversion of their property.

In superior court, the City moved for summary judgment on the plaintiffs' as-applied and facial constitutional claims, as well as the plaintiffs' conversion claims. The plaintiffs moved for summary judgment as to their as-applied and conversion claims. In the plaintiffs' opposition to the City's motion for summary judgment, the plaintiffs framed their facial challenge to the City's obstruction encampment definition as specific to the in-a-park category. In their opposition, the plaintiffs asserted that "by allowing any person or dwelling anywhere in a park to be declared an obstruction and summarily swept ... [FAS 17.01, section 3.4] go[es] much too far and manifestly tread[s] on the constitutional rights Plaintiffs invoke here" by allowing the "destruction and dispossession" of homes or property without notice and meaningful offers of shelter.

---

[8] In addition to Kitcheon and Ream, Austin Rusnak was an individual plaintiff in the original complaint, alleging as-applied and facial challenges under the privacy and cruel punishment provisions of the Washington State Constitution, as well as claims of conversion. Rusnak is also included in the plaintiffs' responses to interrogatories dated March 2, 2020 and June 5, 2020. However, Rusnak is not a plaintiff on appeal and neither the parties' briefs nor the record on appeal provide an explanation as to the status of Rusnak's claims.

The trial court partially granted and partially denied the City's motion regarding the plaintiffs' facial challenges, as well as Kitcheon's and Ream's as-applied and conversion claims. The court partially granted and partially denied the plaintiffs' motion for summary judgment. Relevant to the issues on appeal, the trial court held that Kitcheon and Ream have standing to bring their as-applied claims. In respect to plaintiffs' facial claims, the trial court held that the in-a-park category of FAS 17-01, section 3.4 violates both the privacy and cruel punishment provisions of the Washington State Constitution.

This court granted the City's request for discretionary review.[9]

DISCUSSION

Standard of Review

We review summary judgments and constitutional questions de novo. Allen v. State, 118 Wn.2d 753, 757, 826 P.2d 200 (1992); State v. Fraser, 199 Wn.2d 465, 475, 509 P.3d 282 (2022). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019); CR 56(c).

---

[9] Three amici curiae briefs were filed on behalf of the plaintiffs by: (1) Northwest Justice Project, Columbia Legal Services, University of California Irvine Civil Rights Litigation Clinic, and Professor Erwin Chemerinsky of University of California Berkeley School of Law; (2) Homeless Rights Advocacy Project at Seattle University School of Law and Professor Erwin Chemerinsky of University of California Berkeley School of Law; and (3) Lived Experience Coalition on Homelessness, King County Department of Public Defense, Real Change, and Disability Rights Washington.

Washington State Association of Municipal Attorneys also filed an amicus curiae brief on behalf of the City that urges this court to reject plaintiffs' claim for damages premised on state constitution violations. The trial court ruled that "[d]amages are not available for Ream's and Kitcheon's as-applied claims, and Plaintiffs acknowledge that 'damages are not directly available for violations of the Washington Constitution.'" The only damages claim that the trial court allowed to proceed were some of the conversion claims. Because plaintiffs did not seek review of that ruling and it is not otherwise necessary to decide the issues before us, we do not address it. See RAP 12.1.

We must construe all facts and inferences in favor of the nonmoving party. Scrivener v. Clark College, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). Summary judgment is appropriate only where a trial would be "useless." Wheeler v. Ronald Sewer Dist., 58 Wn.2d 444, 446, 364 P.2d 30 (1961). We may affirm summary judgment on any correct ground. Nast v. Michels, 107 Wn.2d 300, 308, 730 P.2d 54 (1986).

Viability of Partial Facial Challenge

The City first contends as a threshold issue that the plaintiffs may not mount a partial facial challenge to the City's definition of obstruction in FAS 17-01, section 3.4. The City argues the plaintiffs must show that, under the "no set of circumstances" test, there are no set of factual circumstances to which the obstruction encampment definition, as currently written, can be constitutionally applied. See In re Det. of Turay, 139 Wn.2d 379, 417 n.27, 986 P.2d 790 (1999) (citing Ada v. Guam Soc'y of Obstetricians & Gynecologists, 506 U.S. 1011, 1012, 113 S. Ct. 633, 121 L. Ed. 2d 564 (1992) (Scalia, J., dissenting); Fraser, 199 Wn.2d at 486-87; City of Pasco v. Shaw, 161 Wn.2d 450, 458, 166 P.3d 1157 (2007). The City's rationale is based on the premise that the remedy for a successful facial challenge "is to render the statute totally inoperative." Fraser, 199 Wn.2d at 486 (emphasis added) (quoting City of Redmond v. Moore, 151 Wn.2d 664, 669, 91 P.3d 875 (2004)). We disagree and hold that the plaintiffs may lodge a facial challenge particularized to the in-a-park category of FAS 17-01, section 3.4.

The City correctly states that our state's jurisprudence includes many references to the no set of circumstances test. See, e.g., Tunstall ex rel. Tunstall v. Bergeson, 141 Wn.2d 201, 221, 5 P.3d 691 (2000); Fraser, 199 Wn.2d at 486-87. Our state initially

adopted the test from the United States Supreme Court's opinion in United States v. Salerno. See 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). The U.S. Supreme Court later referred to the no set of circumstances language as "a rhetorical flourish" "unsupported by citation or precedent," and clarified that states are not bound by it. Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 1175, 116 S. Ct. 1582, 134 L. Ed. 2d 679 (1996); see also City of Chicago v. Morales, 527 U.S. 41, 55 n.22, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (plurality opinion) (noting that the no set of circumstances test "has never been the decisive factor in any decision of this Court, including Salerno itself [wherein the Court considered a facial challenge]").

Our state Supreme Court has also expressly recognized that Washington courts are not bound by the no set of circumstances test, although it may provide an "excellent framework" for some analyses. Turay, 139 Wn.2d at 417 n.27. In Robinson v. City of Seattle, this court held that the Salerno test is not mandated for a facial challenge in state court, much less "a challenge under the state constitution." 102 Wn. App. 795, 807, 10 P.3d 452 (2000). Instead, in a taxpayer's facial challenge, courts should use a test "dictated by the nature of the challenge." Robinson, 102 Wn. App. at 808.

Robinson is instructive here. In Robinson, taxpayers appealed the trial court's summary judgment in favor of the City of Seattle regarding the constitutionality of the municipality's preemployment urinalysis drug testing program. 102 Wn. App at 800, 804. This court held the challenged statute created five "categories" of job duties for which applicants could be drug tested, including "public safety responsibilities" and "handling dangerous substances." Robinson, 102 Wn. App at 800-01, 808. This court also held the plaintiffs' apparent concession that the city ordinance was constitutional as it

pertained to police and firefighters under the "public safety responsibilities" category did not defeat a facial challenge to the ordinance's other four enumerated categories. Id. at 807, 828.

The City requests this court to disregard Robinson in favor of our state Supreme Court's approach in Fraser, 199 Wn.2d at 486-87. But Fraser makes no mention of Robinson, which remains good law. Moreover, Fraser is inapposite. In Fraser, the court examined a facial challenge to a standalone prong of the driving under the influence statute, RCW 46.61.502(1)(b), which criminalizes driving a vehicle when a person has a THC concentration of 5.00 ng/mL within two hours after driving. 199 Wn.2d at 469. The court held the per se THC prong of RCW 46.61.502(1)(b) was not facially unconstitutional, reasoning that the defendant's "own expert testified that some people are impaired at 5.00 ng/mL" thus making the THC prong "a legitimate exercise of police powers." Fraser, 199 Wn.2d at 487. If the court had alternatively held the prong was unconstitutional, then the entire standalone THC prong would have been invalidated. See Fraser, 199 Wn.2d at 486 (citing Moore, 151 Wn.2d at 669). In the instant case, plaintiffs seek the partial invalidation of one category inserted into a larger definitional rule. See FAS 17-01, § 3.4. In the instant case, plaintiffs seek the partial invalidation of one category of application of Seattle's rules, based on explicit constitutional protections.  See FAS 17-01, s 3.4.  This is a different "nature" of a challenge than the one made in Fraser, because plaintiffs assert that the in-a-park category authorizes encroachment upon constitutionally protected rights without observance of the conditions the law requires for such invasion, be it in the case of article I, section 7 a

warrant exception or other authority of law. See Robinson, 102 Wn. App. at 808-09; RCW 46.61.501(1)(a)-(d).[10]

The City next contends that Robinson is distinguishable because the categories therein were "created by the ordinance" as opposed to the trial court's "judicial[ly] subdividing" the City's obstruction definition under FAS 17-01, section 3.4 between tents and persons that do not obstruct and those that create "actual obstructions." We reject the City's argument based on its premise and merits. First, under de novo review, we assume a fresh review of the record on review and conduct our own analysis not bound by deference to the trial court. W. Rivers Conservancy v. Stevens County, 18 Wn. App. 2d 84, 87 n.1, 490 P.3d 249 (2021); Prostov v. Dep't of Licensing, 186 Wn. App. 795, 812 n.15, 349 P.3d 874 (2015). Second, we hold that a plain language interpretation of FAS 17-01, section 3.4 reveals three different and independent categories under which encampments may qualify as obstructions so as to be immediately removeable without notice under the City's rules. See FAS 17-01, § 4.1.

As is the case for standard statutory interpretation, "where a regulation is clear and unambiguous, words in a regulation are given their plain and ordinary meaning

---

[10] The other in-state cases the City cites in support of its contention that the no set of circumstances test bars the plaintiffs' facial challenge to a portion of FAS 17-01, section 3.4 were either filed before Robinson or are inapposite to the type of category-based facial challenge Robinson and the instant case share. See, e.g., Woods v. Seattle's Union Gospel Mission, 197 Wn.2d 231, 239, 481 P.3d 1060 (2021) (classifying plaintiff's challenge to religious exemption within definition of "employer" under the Washington Law Against Discrimination as an as-applied challenge and stating the exemption was previously held as facially valid) (discussing Ockletree v. Franciscan Health Sys., 179 Wn.2d 769, 788-89, 317 P.3d 1009 (2014), wherein our state Supreme Court does not discuss the no set of circumstances test); Shaw, 161 Wn.2d at 455, (addressing challenge to municipal ordinance requiring landlords to provide certificate of inspection for business license); Moore, 151 Wn.2d at 669 (regarding challenge to driver's license suspension statute and penalty statutory prong); see generally Chong Yim v. City of Seattle, 194 Wn.2d 651, 451 P.3d 675 (2019) (discussing constitutional challenges to "first in time" municipal ordinance requiring landlords to provide notice of rental criteria, screen applications chronologically, and offer tenancy to the first qualifying applicant).

unless a contrary intent appears." Silverstreak, Inc. v. Wash. State Dep't of Lab. & Indus., 159 Wn.2d 868, 881, 154 P.3d 891 (2007). Traditional rules of grammar are used. Dep't. of Lab. & Indus. v. Slaugh, 177 Wn. App. 439, 447, 312 P.3d 676 (2013). Where language is unambiguous, a court need not imagine alternative interpretations. Fraternal Ord. of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Ord. of Eagles, 148 Wn.2d 224, 239-40, 59 P.3d 655 (2002).

First, turning to FAS 17-01, section 3.4, a colon introduces an enumeration of three definitions for what may constitute an obstruction:

> "Obstruction" means people, tents, personal property, garbage, debris or other objects related to an encampment that: are in a City park or on a public sidewalk; interfere with the pedestrian or transportation purposes of public rights-of-way; or interfere with areas that are necessary for or essential to the intended use of a public property or facility.

FAS 17-01, § 3.4; see Slaugh, 177 Wn. App. at 448-49.

Second, the semicolons and the use of "or" demonstrate the three categorical definitions each provide a different and independent criterion for when "people, tents, personal property, garbage, debris or other objects related to an encampment" are subject to immediate removal. FAS 17-01, §§ 3.4, 4.1-.2; see Tateuchi v. City of Bellevue, 15 Wn. App. 2d 888, 902 n.15, 478 P.3d 142 (2020). Semicolons objectively show a stronger separation between the categories of obstruction encampments than commas otherwise would. See Tateuchi, 15 Wn. App. 2d at 902 n.15. The use of "or" in a list of options means that "any" qualify under the proviso, rather than "all" being required to satisfy the definition. Campbell v. Bd. for Volunteer Firefighters, 111 Wn. App. 413, 421 n.3, 415 P.3d 216 (2002). Thus, under the City's in-a-park category, encampments "in a City park or on a public sidewalk" need not create an interference to

constitute an obstruction encampment. FAS 17-01, § 3.4. The category stands on its own to authorize, under the City's rules, the City's immediate removal of an encampment without notice. FAS 17-01, § 3.4.

When a court determines that a portion of a statute or rule is unconstitutional, longstanding principles of severability permits the unconstitutional text to be stricken if it is "distinct and separable" from the unproblematic text. State v. Derbyshire, 79 Wash. 227, 241, 140 P.540 (1914); see El Centro De La Raza v. State, 192 Wn.2d 103, 132-33, 428 P.3d 1143 (2018).

The City contends that Robinson should not control because the provisions "are so connected and interdependent in their meaning and purpose that it could not be believed that the legislature would have passed one without the other." See Pasado's Safe Haven v. State, 162 Wn. App. 746, 754, 259 P.3d 280 (2011) (quoting Jensen v. Henneford, 185 Wash. 209, 220, 53 P.2d 607 (1936)). Still, the City does not explain how the three provisions are "so connected and interdependent" to be necessary to the rule as a whole. We decline to address this argument further on the principle that constitutional arguments should not be considered when they are conclusory or have not been adequately briefed. Lund v. State Dep't of Ecology, 93 Wn. App. 329, 340, 969 P.2d 1072 (1998); City of Spokane v. Taxpayers of City of Spokane, 111 Wn.2d 91, 96, 758 P.2d 480 (1988). Based on the foregoing plain language interpretation, we hold that the in-a-park category is severable from the City's obstruction encampment definition in FAS 17.01, section 3.4. Accordingly, the plaintiffs' facial challenge to the in-a-park category is not barred.

Article I, Section 7

The City argues that the trial court erred in determining that the City's in-a-park category facially violates state constitutional privacy protections under article I, section 7. Specifically, the City asserts that encampment removals do not implicate a protected privacy interest and, alternatively, the City's encampment removal rules are supported by authority of law.

Article 1, section 7 of our state constitution states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The provision does not merely protect against unjustified police action, but government action. See Shaw, 161 Wn.2d at 458-60 (defining government action for the purposes of privacy protections under article I, section 7); York v. Wahkiakum Sch. Dist. No. 200, 163 Wn.2d 297, 316, 178 P.3d 995 (2008) (holding school district's random drug testing of student athletes as unconstitutional under article I, section 7).

An assertion of disturbance of private affairs analysis under article I, section 7 requires a court to determine whether a disturbance of private affairs has indeed occurred and, if so, whether the government's intrusion is justified by authority of law. City of Seattle v. McCready, 123 Wn.2d 260, 270, 868 P.2d 134 (1994); see WPEA, 194 Wn.2d at 506-07. Fundamentally, "[i]f a private affair is not disturbed, then there is no violation of article I, section 7." State v. Reeder, 184 Wn.2d 805, 814, 365 P.3d 1243 (2015) (citing State v. Miles, 160 Wn.2d 236, 244, 156 P.3d 864 (2007)); WPEA, 194 Wn.2d at 507 (citing Miles, 160 Wn.2d at 243-44).

Our state Supreme Court has held there are two protected privacy interests under article I, section 7: (1) the right to nondisclosure of intimate personal information

18

and (2) the right to autonomous decision-making. WPEA, 194 Wn.2d at 504 (citing O'Hartigan, 118 Wn.2d at 117).

The latter right to autonomous decision-making is a fundamental right and "involves issues related to marriage, procreation, family relationships, child rearing and education." O'Hartigan, 118 Wn.2d at 117. Government infringement on the right to autonomy must be narrowly tailored to a compelling interest. WPEA, 194 Wn.2d at 504. Neither party argues the right to autonomy applies here.

Conversely, the right to the nondisclosure of personal information is not fundamental. O'Hartigan, 118 Wn.2d at 117. The right is implicated in the disclosure of information such as one's name, birth date, employment history, criminal convictions, medical history, and transgender status. See, e.g., Peninsula Counseling Ctr. v. Rahm, 105 Wn.2d 929, 935-36, 719 P.2d 926 (1986); O'Hartigan, 118 Wn.2d at 116-18; Ino Ino, Inc. v. City of Bellevue, 132 Wn.2d 103, 123-25, 937 P.2d 154 (1997); WPEA, 194 Wn.2d at 507-08; John Doe 1 v. Wash. State Dep't of Corr., 2021 WL 2453099, at *7-8 (E.D. Wash. May 17, 2021) (analyzing state constitutional claim).

On its face, FAS 17-01 implicates article I, section 7's protected privacy interest in the nondisclosure of personal information. FAS 17-01 defines an encampment as "one or more tent, structure, or assembly of camping equipment or personal property ... which appears to a reasonable person as being used for camping." § 3.2.[11]

---

[11] FAS 17-01 does not define "camping," but MDAR 17-01, section 3.3 defines "camp" and "camping" as:

> to erect a tent or other shelter, or to assemble on a public place or City property camping equipment or personal property that to a reasonable person evidences that a person has remained, or intends to remain, on the property overnight or on the property when it is closed to the public. Camping equipment includes but is not limited to tarps, blankets, sleeping bags, cooking equipment, and other items commonly associated with remaining overnight.

Encampment removals can result in not only intrusions, but devastating losses of one's dwelling and most personal possessions and necessaries. Sara K. Rankin, <u>Punishing Homelessness</u>, 22 NEW CRIM. L. REV. 99, 113-14 (2019). Encampment removals may, for example, result in the taking and destruction of encampment residents' state identification cards, social security cards, passports, and birth certificates. Rankin, <u>supra</u>, at 113.

As a practical matter, the City does not disagree that in the course of removing obstructions under the in-a-park category, city personnel remove tents or structures wherein the unhoused keep their most personal possessions and personal information. In fact, the rules state that "[p]hysical obstructions that are personal property shall be removed and stored by the City." FAS 17-01, § 4.4. Under FAS 17-01, "Personal Property" means

> an item that: is reasonably recognizable as belonging to a person; has apparent utility in its present condition and circumstances; and is not hazardous. Examples of personal property include but are not limited to identification, personal papers and documents, tents, bicycles, radios and other electronic equipment, eyeglasses, prescription medications, photographs, jewelry, crutches, and wheelchairs. Personal property does not include building materials such as wood products, metal, pallets, or rigid plastic. The relevant staff member will determine whether an item is personal property, and in cases when the status of an item cannot reasonably be determined in the staff member's judgment based on the totality of the circumstances, the staff member will treat the item as personal property under this rule.

FAS 17-01, § 3.5. The City is required to maintain a log of personal property removed from an encampment. FAS 17-01, § 11.5.

Plaintiffs cite <u>State v. Pippin</u>, which held that a dwelling, a tent, or "improvised structure," and its contents can be "the sort of closed-off space that typically shelters the intimate and discrete details of personal life protected by article I, section 7." 200 Wn.

App. 826, 841, 403 P.3d 907 (2017). Pippin was unhoused and inside a tarp-covered "tent-like structure" set between a guardrail on a public road and a chain link fence on private property when police officers, who were trying to notify individuals about a new camping ordinance, lifted his tent's flap and observed a bag of methamphetamine inside. Id. at 828-29, 831-32. Pippin was charged with possession of a controlled substance and moved to suppress the methamphetamine evidence. Id. at 832. The Pippin court held that a tent-like temporary structure may be an unhoused individual's "only refuge for privacy" and that one maintains a protected privacy interest in their temporary dwelling even if it is wrongfully on public property.[12] Id. at 841.

The City argues the Pippin court's recognition of a protected privacy interest in a tent-like structure should be cabined to criminal investigations. We observe the officers first contacted Pippin because they were trying to provide him information about a new camping ordinance, not because they were conducting a criminal investigation. Pippin, 200 Wn. App at 828-29, 831-32. Regardless, the City's own rules recognize that removing encampments could mean handling people's identification, personal papers and documents, and prescription medications. FAS 17-01, § 3.5. The language of FAS 17-01 plainly shows the in-a-park category implicates a protected privacy interest in the nondisclosure of one's personal information.

However, even where the right to nondisclosure of personal matters is a valued right meriting constitutional protection, the right is not absolute. Where the State has a legitimate governmental interest, some intrusion upon that right may be justified.

---

[12] The Ninth Circuit has held that the government's seizure and destruction of unhoused individuals' temporarily unattended and unabandoned personal property left on public property was unreasonable under the Fourth Amendment. Lavan v. City of Los Angeles, 693 F.3d 1022, 1024, 1030-31, 1033 (9th Cir. 2012).

O'Hartigan, 118 Wn.2d at 124. Our state Supreme Court in WPEA held that the government's intrusion of the right to the nondisclosure of personal information is subject to rational basis review. "The rational basis test requires that a regulation be carefully tailored to meet a legitimate governmental goal." WPEA, 194 Wn.2d at 505 (quoting O'Hartigan, 118 Wn.2d at 117); Ino Ino, Inc., 132 Wn.2d at 124. This test may not be satisfied when a law purports to authorize "standardless, boundless inquiries." O'Hartigan, 118 Wn.2d at 121. The burden is thus on the challenger to demonstrate the government's intrusion is not supported by authority of law. WPEA, 194 Wn.2d at 506-07.

Similar to the plaintiffs in WPEA, plaintiffs in the instant case seemingly urge us to apply a heightened standard that has been used in criminal cases. See 194 Wn.2d at 506. Such criminal cases apply a two-step analysis that is peculiarly centered in the notion that article I, section 7 provides greater protection than the federal constitution and "clearly recognizes an individual's right to privacy with no express limitations." State v. Young, 123 Wn.2d 173, 180, 867 P.2d 593 (1994) (quoting State v. Simpson, 95 Wn.2d 170, 178, 622 P.2d 1199 (1980)); see State v. Villela, 194 Wn.2d 451, 461-62, 458, 450 P.3d 170 (2019).

The first step considers whether the State unreasonably intruded into a person's private affairs. State v. Boland, 115 Wn.2d 571, 577-79, 800 P.2d 1112 (1990); State v. Myrick, 102 Wn.2d 506, 510-11, 688 P.2d 151 (1984); State v. McKinney, 148 Wn.2d 20, 27, 32, 60 P.3d 46 (2002). Unlike the Fourth Amendment's subjective test, our state privacy protection in a search or seizure context "focuses on those privacy interests which citizens of this state have held, and should be entitled to hold, safe from

22

governmental trespass absent a warrant." Boland, 115 Wn.2d at 577 (quoting Myrick, 102 Wn.2d. at 510-11); see Katz v. United States, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). If this first prong is met, the State bears the burden of demonstrating that authority of law, such as a valid warrant or warrant exception, justifies the unreasonable intrusion. Villela, 194 Wn.2d at 458. The WPEA court described this test as a "stricter standard derived from criminal cases"[13] and rejected its application where a public records request encompassed records that contained birth dates associated with names. 194 Wn.2d at 489, 506-07, 506 n.10.

Plaintiffs note they argued in superior court that a court should review the City's encampment removals under strict scrutiny based on the strong protections our state constitution extends to the home. Other than citing cases wherein our state Supreme Court has held the home receives heightened constitutional protection in a criminal context, plaintiffs provide no authority in their briefing to support their contention. State v. Ruem, 179 Wn.2d 195, 200, 313 P.3d 1156 (2013); Young, 123 Wn.2d at 185. "[U]nder both state and federal constitutions, a mere rational basis test [is] applied in analyzing a plaintiff's claim of privacy interest in non-disclosure of personal information."

---

[13] To be clear, the WPEA court referenced "criminal cases" in terms of cases that "involve a direct government intrusion into a person's home, effects, or other private affairs, i.e., a 'search or seizure.'" 194 Wn.2d at 507 (emphasis added). This is not inconsistent with cases plaintiffs cite that did not involve criminal charges or convictions. In two of these cases, the reviewing court held that suspicionless urine drug testing undoubtedly constituted warrantless searches under federal constitutional law before applying a heightened protection analysis under article I, section 7. See Robinson, 102 Wn. App. at 812-14, 818-19, 823-26; York, 163 Wn.2d at 307-11, 316. Plaintiffs offer no such argument in their briefing. Also, in McCready, our state Supreme Court considered the particular issue of whether a court may issue warrants without probable cause to authorize entry into apartments for code inspections. 123 Wn.2d at 272-82. In sum, these non-criminal cases involved a governmental action that in and of itself was an intended search. As we explain below, this is unlike the instant case where the disclosure of intimate personal information is a byproduct of the governmental action of removing encampments in city parks or on public sidewalks.

Ramm v. City of Seattle, 66 Wn. App. 15, 26, 830 P.2d 395 (1992) (discussing O'Hartigan, 118 Wn.2d at 118); see also Ramm, 66 Wn. App. at 26 ("Relationships within the home are indeed sacred, but only if they pertain to fundamental autonomy rights.").

In the instant case, under the City's rules, removal of obstructions may be conducted by city personnel as opposed to police. FAS 17-01, § 4.2. In fact, the FAS 17-01 rules exist "to establish uniform rules and procedures for removing encampments" by specific city departments.[14] See FAS 17-01, § 1.2. All city departments conducting an encampment removal according to the FAS rule are required to "notify the FAS Encampment Cleanup Program Manager of the proposed cleanup prior to initiating the cleanup." MDAR 17-01, § 4.2. To be sure, the rules grant the FAS director or the director's designees the authority during an encampment removal action to act as the complainant to request police actions to exclude individuals from any city property or to enforce city trespass laws, including, without limitation, SMC 18.12.279[15] and 12A.08.040.[16] Additionally, MDAR 17-01, section 8.2.2 requires the appropriate law enforcement agency to be notified of contraband found during an encampment removal.[17] But, such potential law enforcement involvement is fact-

---

[14] The city departments are: Seattle Department of Parks and Recreation, Seattle Public Utilities, Seattle City Light, Seattle Department of Transportation, Department of Finance and Administrative Services, the Department of Neighborhoods, Office of Housing, and Seattle Center. MDAR 17-01, § 3.7.

[15] Establishing the gross misdemeanor crime of "trespass in parks" when people enter or remain in parks from which they have "been excluded during the period covered by an exclusion notice" or when they enter or remain on, or are otherwise present within, "the premises of a park during hours which the park is not open to the public" unless otherwise permitted.

[16] City's criminal trespass ordinance to address when people knowingly enter or remain unlawfully in a building or knowingly enter or remain "unlawfully in or upon premises of another."

[17] "The authorizing official shall, before disposal, allow the appropriate law enforcement agency the opportunity to take possession of any item that is contraband or evidence of a possible crime." MDAR 17-01, § 8.2.2.

dependent and reaches beyond what is facially authorized by the City's encampment removal rules.[18] See MDAR 17-01, §§ 4.3, 6.0.

Moreover, on the whole, the plain text of the City's encampment removal rules reveals that the underlying purpose and goal of the City's removals is not to search encampments for incriminating evidence or otherwise carry out governmental investigative objectives, but to remove an encampment that constitutes "a threat to the public safety and health and interferes with the public's ability to use City-owned and City-controlled property, facilities, and rights-of-way for its intended purposes." FAS 17-01, § 1.1. Such conduct of concern is further defined under the City's rules as "[t]he unauthorized entry" onto property when closed to the public and the erection of "unauthorized structures, tents, or other shelters in locations that create an obstruction or an immediate hazard." FAS 17.01, §§ 1.1.1-.2 (emphasis added).

Thus, because the City's encampment removal rules are not facially positioned within a search or seizure context, the City's in-a-park category is subject to rational basis review. We decline to otherwise depart from established authority. See W.G. Clark Const. Co. v. Pac. Nw. Reg'l Council of Carpenters, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014) ("Generally, under stare decisis, we will not overturn prior precedent unless there has been 'a clear showing that an established rule is incorrect and harmful.'")

---

[18] Notably, the City's obstruction definition under FAS 17-01, section 3.4 bypasses criminal trespass or park exclusion notice procedures, see SMC sections 18.12.278.A.2 and 18.12.030.A.11, by permitting the removal of "people" related to encampments as well as "tents, personal property, garbage, debris or other objects related to an encampment." See FAS 17-01, § 3.4 (emphasis added); see also MDAR 17-01, § 4.3 (stating that individuals who refuse to leave property where encampment removal is being conducted or who obstruct a removal are subject to park exclusion or trespass arrest, as well as other traffic, street and sidewalk use, and criminal codes).

25

(quoting In re Stranger Creek & Tributaries in Stevens County v. John O. Alby, 77 Wn.2d 649, 653, 466 P.2d 508 (1970)).

It is undisputed that the City has a legitimate interest in promoting the health and safety of the public. Munns v. Martin, 131 Wn.2d 192, 200, 930 P.2d 318 (1997); see also Robinson, 102 Wn. App. at 823. We therefore focus our analysis on whether the in-a-park category within FAS 17-01, section 3.4 is carefully tailored to the City's furtherance of that interest. We hold that it is not.

On its face, the rules do not bind the in-a-park category with minimum requirements or standards that connect those obstructions to health and safety concerns. To restate the challenged provision, the in-a-park category allows the City to immediately remove "people, tents, personal property, garbage, debris or other objects related to an encampment" merely because the encampment exists "in a City park or on a public sidewalk." FAS 17-01, § 3.4. By definition, these obstructions need not pose an immediate hazard, interfere with pedestrian or transportation purposes of public-rights-of-way, or interfere with areas necessary for or essential to the intended uses of public property or a public facility, which the rules independently make removable. FAS 17-01, §§ 3.3-.4. Moreover, the City's rules define personal property as an item "reasonably recognizable as belonging to a person ... and [that] is not hazardous." FAS 17-01, § 3.5 (emphasis added). Consequently, as written, the in-a-park category does not require the relevant obstruction to have any relation to a public health or safety threat. To the extent that such obstructions are encampments that encompass intimate personal information, as the City's own rules recognize, allowing such indiscriminate and standardless removal violates article I, section 7 because the authorization is not carefully tailored to

26

meet the City's legitimate goals. Accordingly, the in-a-park category of FAS 17-01, section 3.4 is facially unconstitutional and should be severed from the rule. We affirm the trial court's order only to this extent.

It is, however, not a court's role to draft a constitutional statute or rule. Hale v. Wellpinit Sch. Dist. No. 49, 165 Wn.2d 494, 506, 198 P.3d 1021 (2009); see Ctr. for Env't L. & Pol'y v. Dep't of Ecology, 196 Wn.2d 17, 27, 468 P.3d 1064 (2020). "'[T]he drafting of a statute is a legislative, not a judicial, function.'" State v. Jackson, 137 Wn.2d 712, 725, 976 P.2d 1229 (1999) (quoting State v. Enloe, 47 Wn. App. 165, 170, 734 P.2d 520 (1987)). We thus reverse the trial court's order to the extent that it suggests or provides guidance as to how the City's encampment removal rules may be rewritten to meet constitutional muster.

Article I, Section 14

Because our underlying analysis is the same, we next address both the City's appeals in regard to the plaintiffs' facial and as-applied claims under the cruel punishment provision of the Washington State Constitution. In respect to the plaintiffs' facial claims, the City contends the trial court erred in its holding that the City's enforcement of its encampment abatement program violates article I, section 14. As to the plaintiffs' as-applied claims, the City argues that because Kitcheon or Ream were not cited or arrested in connection with an encampment removal, the trial court erred in holding they have standing to bring such claims. For the same reason, even if Kitcheon and Ream have standing, the City argues they each fail to state a viable cruel punishment claim, presumably under CR 12(b)(6). We hold that because the in-a-park category does not facially subject violators to criminal penalties and neither individual

27

plaintiff was criminally penalized for violating the City's encampment removal rules, both facial and as-applied cruel punishment claims necessarily fail for lack of punishment under article I, section 14.

*A. Facial Challenge*

"Although the legislature has authority to set punishment for crimes, 'legislative authority is ultimately circumscribed by the constitutional mandate forbidding cruel punishment.'" State v. Carter, 3 Wn.3d 198, 213, 548 P.3d 935 (2024) (quoting State v. Fain, 94 Wn.2d 387, 402, 617 P.2d 720 (1980)). Article 1, section 14 of our state constitution states that "[e]xcessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted."

The plaintiffs assert the City's in-a-park category violates article I, section 14 by exposing unhoused individuals to civil penalties that can lead to criminal punishments for "simply sleeping outdoors" and "invading their homes, taking their property, and displacing them." FAS 17.01, § 3.4.

The plaintiffs in part rely on the Ninth Circuit's holding in Martin v. City of Boise, 920 F.3d 584 (9th Cir. 2019), which was abrogated after the trial court's order by City of Grants Pass, Oregon v. Johnson, 144 S. Ct. 2202, 219 L. Ed. 2d 941 (2024). In Martin, the Ninth Circuit held the Eighth Amendment's prohibition of cruel punishment barred the City of Boise from enforcing an ordinance that criminalized the use of "streets, sidewalks, parks, or public places" for "camping." Martin, 920 F.3d at 603. The Martin court held that the city could not enforce its public-camping misdemeanor law against unhoused individuals who did not have "access to alternative shelter." Martin, 920 F.3d at 615, 617-18.

The U.S. Supreme Court, however, recently overruled Martin, holding that the Eighth Amendment's "Cruel and Unusual Punishments Clause focuses on the question [of] what 'method or kind of punishment' a government may impose after a criminal conviction, not on the question [of] whether a government may criminalize particular behavior in the first place or how it may go about securing a conviction for that offense." Johnson, 144 S. Ct. at 2216 (emphasis added) (quoting Powell v. Texas, 392 U.S. 514, 531-32, 88 S. Ct. 2145, 20 L. Ed. 2d 1254 (1968) (plurality opinion)). The Court also noted that it "has never held that the Cruel and Unusual Punishments Clause extends beyond criminal punishments to civil fines and orders." Johnson, 144 S. Ct. at 2216 n.4. Based on the abrogation of Martin, the Eighth Amendment can no longer provide a floor for the plaintiffs' state cruel punishment claims.

The plaintiffs in their briefing correctly assert our state constitution's cruel punishment provision has been held more protective than the Eighth Amendment, albeit in certain contexts. Fain, 94 Wn.2d at 402; State v. Ramos, 187 Wn.2d 420, 454, 387 P.3d 650 (2017) ("Even where it is already established that the Washington Constitution may provide enhanced protections on a general topic, parties are still required to explain why enhanced protections are appropriate in specific applications."). The plaintiffs, however, for the reasons that follow, fail to establish how our state prohibition against cruel punishment, at its baseline, applies to ordinances for which there is no directly attached criminal penalty. Because hypothetical criminal consequences do not constitute punishment under article I, section 14's prohibition of cruel punishment, plaintiffs' arguments fail.

29

At the time of our state constitution's ratification, cruelty was largely understood to have two elements: that of punishment beyond what is necessary and an "absence of mercy." State v. Rivers, 129 Wn.2d 697, 723, 921 P.2d 495 (1996) (Sanders, J., dissenting). To determine the meaning of "punishment" under article I, section 14, we look at the word's "common and ordinary meaning" at the time our state constitution was drafted. Wash. Water Jet Workers Ass'n v. Yarbrough, 151 Wn.2d 470, 477, 90 P.3d 42 (2004); see also Bloomer v. Todd, 3 Wash. Terr. 599, 615, 19 P. 135, 1 L.R.A. 111 (1888).

Several of the delegates to the Constitutional Convention of 1889 were lawyers. Southcenter Joint Venture v. Nat'l Democratic Pol'y Comm., 113 Wn.2d 413, 423, 780 P.2d 1282 (1989). In the nineteenth century, appropriate punishment was understood by Washingtonians to mean a criminal sentence that was proportionate to the crime committed and the individual convicted of committing it. Rivers, 129 Wn.2d at 724 (Sanders, J., dissenting). This understanding was also shared by the legal community of the time and often articulated in natural law rhetoric. Id.

In its practical application, our state has mainly analyzed cruel punishment claims in the context of disproportionate sentencing. See, e.g., State v. Gregory, 192 Wn.2d 1, 19, 427 P.3d 621 (2018); State v. Bassett, 192 Wn.2d 67, 91, 428 P.3d 343 (2018). Such punishment necessarily flows from a conviction for a specific offense and is evaluated based on its proportionality to the crime for which it is imposed. See State v. Flores, 114 Wn. App. 218, 223, 56 P.3d 622 (2002). In its recent holding that article I, section 14 also prohibits cruel conditions of confinement for prisoners, our state Supreme Court acknowledged that confinement conditions "are inherently part of the

30

punishment imposed on prisoners." In re Pers. Restraint of Williams, 198 Wn.2d 342, 367, 496 P.3d 289 (2021). The court reasoned "but for" an incarcerated person's conviction and sentence, they would not be confined. Williams, 198 Wn.2d at 367 (emphasis added). The court held because it was not logical to assess the proportionality of one's confinement conditions to the crime for which they were being punished, the test in the context of confinement conditions is instead whether the conditions are "reasonably necessary to accomplish [the] legitimate penological goals" "of deterrence, incapacitation, and rehabilitation." Williams, 198 Wn.2d at 368-69. (emphasis added).

Additionally, our state Supreme Court has held that in respect to a facial challenge the focus "is on the sanction allowed by the statute, not the actual sanction imposed in a particular case." Winchester v. Stein, 135 Wn.2d 835, 847, 959 P.2d 1077 (1988) (emphasis added). In the instant case, the in-a-park category does not on its own provide for criminal penalties for violators. Thus, there is no directly resulting criminal punishment that can be assessed as to its proportionality to the offense of living in an encampment that exists in a park or on a public sidewalk. See FAS 17-01, § 3.4. Put simply, there are no criminal penalties facially at work to which article I, section 14 protections could apply.

The plaintiffs cite MDAR 17-01, section 4.3 in support of the in-a-park's category purported proximity to criminal penalties. As mentioned above, under the rule, city personnel may "request police action to exclude individuals from any City-owned or City-controlled property or to enforce trespass laws of the City." The rule goes on to state:

31

> Individuals who <u>may be</u> excluded or charged with trespass include but are not limited to individuals who are reasonably believed to reside at the encampment being removed and who refuse to leave, or individuals who obstruct the expeditious progress of the removal. Individuals who are not subject to a charge of trespass on City-controlled rights-of-way <u>may be</u> subject to [the vehicles and traffic, criminal, and street and sidewalk use provisions of the city code].

MDAR 17-01, § 4.3 (emphasis added).

Similarly, under MDAR 17-01, section 6.1, the City's rules state that any violation of its rules "or any other applicable rule or law may, depending on the particular circumstances, result in" withdrawal of an individual's permission to remain on the property, issuance of an exclusion notice from Parks Department property, issuance of an administrative notice of exclusion from other property, and/or "[i]ssuance of a citation, a notice of infraction, or other enforcement action under applicable law."

But hypothetical, fact-dependent consequences of standalone criminal offenses that merely coincide with a civil violation are not equivalent to government sanctions designed to punish a convicted individual for a specific criminal offense. Because the challenged in-a-park category does not facially constitute an offense from which a criminal penalty flows, there is no per se punishment to which article I, section 14 protections may apply.

For this same reason, the plaintiffs' contention that the in-a-park category punishes individuals based on their involuntary unhoused "status" fails.[19] The in-a-park

---

[19] To support their argument, the plaintiffs in part cite state cases holding that wealth-based classifications warrant heightened scrutiny in an equal protection analysis. See State v. Phelan, 100 Wn.2d 508, 514, 671 P.2d 1212 (1983); In re Pers. Restraint of Mota, 114 Wn.2d 465, 474, 788 P.2d 538 (1990). Although the plaintiffs' status-based argument fails in the context of a cruel punishment claim, this does not necessarily preclude such an argument in the context of a different constitutional provision. See also Johnson, 144 S. Ct. at 2216 ("To the extent the Constitution speaks to those other matters [such as whether the state may criminalize particular behavior], it does so, as we have seen, in other provisions.").

category does not make the mere status of being unhoused a crime. See Johnson, 144 S. Ct. at 2217 (citing and discussing the U.S. Supreme Court's holding in Robinson v. California, 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962)).

The plaintiffs provide a Gunwall analysis to argue the protective reach of article I, section 14 compels a determination that the in-a-park category facially constitutes cruel punishment. See State v. Gunwall, 106 Wn.2d 58, 720 P.2d 808 (1986).[20] But a Gunwall analysis is only helpful to the extent of determining that article I, section 14 provides greater protection in a certain context to require a court's independent analysis, not whether a method or form of government-imposed punishment is prohibitively cruel. See Gunwall, 106 Wn.2d at 64-70; Williams, 198 Wn.2d at 362-69. As a fundamental matter, plaintiffs do not provide binding authority to establish that the in-a-park category may be invalidated under article I, section 14 based on mere threats of tangentially-related criminal penalties.[21] Without a complete analysis, we are precluded from drawing constitutional conclusions from the plaintiffs' Gunwall application. See State v. Johnson, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) ("Parties raising constitutional issues must present considered arguments to this court."); Bercier v. Kiga, 127 Wn. App. 809, 824, 103 P.3d 232 (2004) ("We need not consider

---

[20] The test set forth in State v. Gunwall provides six factors to determine whether our state constitution provides broader protection to its citizens than the U.S. Constitution: "(1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern." 106 Wn.2d at 58.

[21] The plaintiffs cite two out-of-jurisdiction federal district court cases to support the contention that threats of arrest and move-along orders can constitute the initiation of a criminal process under the Eighth Amendment. See Phillips v. City of Cincinnati, 479 F. Supp. 3d 611, 656 (S.D. Ohio 2020); Coal. on Homelessness v. City & County of San Francisco, 647 F. Supp. 3d 806, 841 (N.D. Cal. 2022), aff'd in part, remanded in part, No. 23-15087, 2024 WL 125340 (9th Cir. Jan. 11, 2024). Both of these cases, however, center their discussions around the Ninth Circuit's opinion in Martin, 920 F.3d 584 (9th Cir. 2019), which, as we discuss above, has since been overruled. See Johnson, 144 S. Ct. at 2216.

arguments that are not developed in the briefs and for which a party has not cited authority.").

Part of the plaintiffs' Gunwall analysis relies on our state Supreme Court's analysis in City of Seattle v. Long to support the proposition that the dispossession of an unhoused individual's home constitutes cruel punishment. 198 Wn.2d at 136. But Long is inapposite. The Long court held that the city's impoundment of Long's truck, which he depended on for shelter and his work, and its associated fees constituted an unconstitutionally excessive fine for a minor parking infraction. Long, 198 Wn.2d at 173-76. The court's holding is thus not helpful in a cruel punishment analysis.

We recognize that having one's belongings and temporary home removed without notice may feel punishing,[22] but that does not equate to criminal punishment as contemplated under article I, section 14. Accordingly, we reverse the trial court's order concluding that the in-a-park category is facially unconstitutional under article I, section 14.

## B. As-Applied Challenge

Contrary to a facial challenge, "[a]n as-applied challenge to the constitutional validity of a statute is characterized by a party's allegation that application of the statute in the specific context of the party's actions or intended actions is unconstitutional."

---

[22] For example, encampment removals can result in the taking and destruction of encampment residents' "[p]ersonal identification cards ... [that are] needed to qualify for countless services and are difficult to replace" or other identification documents, all of which "can make it difficult, if not impossible, for someone to access employment, gain access to housing, or even to exercise their basic right to vote." Rankin, supra, at 113-14. Encampment removals can also result in the loss of "[i]tems of significant sentimental value such as photos of lost family members, or vital property such as medication." Rankin, supra, at 113. "The loss of warm clothing, protective tents, and medication directly threatens the health of already vulnerable people." Rankin, supra, at 114.

<u>Moore</u>, 151 Wn.2d at 668-69. In a claim in which a party asserts their rights or status have been affected by a statute, standing requires the party's claimed interest is within the zone of interests protected or regulated by the statute and the statute has caused the party an injury in fact. <u>Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyers Fund, Inc.</u>, 193 Wn.2d 704, 711-12, 445 P.3d 533 (2019).

Individual plaintiffs Kitcheon and Ream contend they have standing to pursue relief under article I, section 14 based on the removal of their shelter and possessions as well as "the threat of arrest and move-along orders" that "can constitute the initiation of the criminal process sufficient to implicate cruel punishment concerns." It is undisputed that Kitcheon and Ream were never arrested or cited "for conduct directly related to unauthorized camping."

Again, we do not discount consequences of encampment removals, including the loss of one's dwelling and possessions. But in the specific legal framework of our state constitution's cruel punishment provision, severe and punishing effects of government conduct do not constitute "punishment" outside of a criminal penalty context. <u>See</u> <u>In re Pers. Restraint of Metcalf</u>, 92 Wn. App. 165, 178-79, 183, 963 P.2d 911 (1998) (rejecting cruel punishment claim based on determination that deduction of incarcerated person's wages to pay incarceration costs and victim compensation fund was remedial and not punishment for criminal conduct). As we analyze above, mere threats of criminal penalties are insufficient to constitute punishment as it is defined under article I, section 14.

Because the record on review does not establish a genuine issue of material fact necessary to establish a cruel punishment claim, we reverse the trial court's order concluding that Kitcheon and Ream had standing to raise cruel punishment claims.[23]

CONCLUSION

It is undisputed that "obstruction" encampments as defined in FAS 17-01, section 3.4 includes those where unhoused individuals live and store their most personal belongings. It is further undisputed that in removing these defined obstructions, the City shall remove personal property reasonably recognized to belong to a person and that is not hazardous. See FAS 17-01, § 3.5. It follows that this procedure implicates a person's right of nondisclosure of intimate personal information. Applying a rational basis review, we hold that the City's in-a-park category within FAS 17-01, section 3.4 allows the indiscriminate and standardless removal of such obstructions and is not carefully tailored to meet a legitimate governmental goal. Accordingly, section 3.4 is facially unconstitutional under article I, section 7 of the Washington State Constitution. We also hold the in-a-park category does not subject violators to criminal punishment as

---

[23] The plaintiffs contend that even if this court decides the standing requirements are not met, "the public importance of the issues raised would militate in favor of finding standing." Wash. State Hous. Fin. Comm'n, 193 Wn.2d at 719. Our state Supreme Court has taken a more flexible approach to standing "when necessary to ensure that an issue of substantial public importance does not escape review." Wash. State Hous. Fin. Comm'n, 193 Wn.2d at 718. "An issue is of substantial public importance when it 'immediately affects substantial segments of the population and its outcome will have a direct bearing on the commerce, finance, labor, industry or agriculture generally.'" Id. (quoting Wash. Nat. Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish County, 77 Wn.2d 94, 96, 459 P.2d 633 (1969)). As discussed at length in respect to the plaintiffs' facial challenge under article I, section 14, because the challenged in-a-park category within FAS 17-01, section 3.4 does not establish the risk of a criminal penalty as contemplated under our state's cruel punishment protections, which is necessary for a viable cruel punishment claim, although the public importance of the issues in this case is clear, the public importance criterion is not met for an article I, section 14 claim. See Wash. Nat. Gas Co., 77 Wn.2d at 96 (stating that an analysis of public importance requires a consideration of "the direct effect" a resolution "will have on the people and the economy of the state").

contemplated under article I, section 14 necessary for a viable cruel punishment challenge. Lastly, because individual plaintiffs Kitcheon and Ream were not subjected to punishment in connection with the City's encampment removal rules, we hold they do not have standing to bring as-applied claims under article I, section 14.

We affirm in part, reverse in part, and remand for further proceedings.

_Cohen, J._

WE CONCUR:

_Birk, J._                    _Hazelrigg, ACJ_